

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-14-2003

# H. v. State Operated Schl

Precedential or Non-Precedential: Precedential

Docket No. 01-2358

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"H. v. State Operated Schl" (2003). *2003 Decisions.* Paper 325.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/325

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2358

S.H., INDIVIDUALLY AND ON
BEHALF OF I.H.,

Appellant

v.

STATE-OPERATED SCHOOL DISTRICT
OF THE CITY OF NEWARK.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 00-cv-02559)
District Judge: The Honorable Joseph A. Greenaway, Jr.

Argued June 6, 2002

BEFORE: SLOVITER, NYGAARD, and BARRY,
*Circuit Judges.*

(Filed July 14, 2003)

Cynthia H. Levy, Esq. (Argued)
15 Prospect Street
Paramus, NJ 07652
   *Counsel for Appellant*

Arsen Zartarian, Esq. (Argued)
Office of General Counsel
Board of Education
2 Cedar Street, 10th Floor
Newark, NJ 07102
    *Counsel for Appellee*

## OPINION OF THE COURT

NYGAARD, *Circuit Judge.*

This Individuals with Disabilities Act case concerns the continuing placement of a hearing impaired child, I.H., in an out-of-district public school. At issue is the Newark School District's proposed individual education plan for I.H. for the 1999-2000 school year, which returned her to in-district placement. I.H. and her mother, S.H., prevailed in their due process hearing at the state administrative level, wherein the Administrative Law Judge concluded that the School District failed to meet its burden in proving that the change in placement would provide a meaningful educational benefit. After S.H. sought attorneys' fees in federal District Court, the School District counterclaimed challenging the administrative decision. The District Court reversed the administrative decision. Central to this case is the appropriate standard of review a District Court should employ when reviewing state administrative proceedings under the Individuals with Disabilities Act. We hold that the appropriate standard is modified *de novo* review. Because the District Court did not apply the correct standard of review, we will reverse.

## I.   Background

### A.   The Individuals with Disabilities Act

This case arises under a confluence of state and federal disabilities law. Therefore, it is useful to review the statutory framework before proceeding to the facts. Federal funding of state special education programs is contingent on the states providing a "free and appropriate education"

to all disabled children. 20 U.S.C. §1412. The Individuals with Disabilities Act (IDEA) is the vehicle Congress has chosen to ensure that states follow this mandate. 20 U.S.C. §1400 *et seq.* "A free, appropriate public education consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 756 (3d Cir. 1995) (citations omitted).

As we noted in *Susan N.,* an Individual Education Program (IEP) is the primary vehicle for providing students with the required free and appropriate education. *Id.* An IEP is a written statement developed for each child that must include several elements. 20 U.S.C. § 1414(1)(A). It must include a statement of the child's current level of performance, and how her disability affects her performance. *Id.* at (1)(A)(I). It must set measurable annual goals relating both to progress in the general curriculum and additional educational needs arising from her disability. *Id.* at (1)(A)(ii). The IEP must detail those special education services and supplementary aids that the school will provide, explain how they will contribute toward meeting the annual goals, how they will allow the child to progress in both the general curriculum and participate in extracurricular activities, and describe how the child will interact with disabled and nondisabled children. *Id.* at (1)(A)(iii). In measuring the child's progress, the IEP must explain whether standard student assessments will be used. If not, the IEP must explain why not and how the school will assess the child. *Id.* at (1)(A)(v).

Besides setting out the required content of an IEP, the IDEA explains how the school is to develop an IEP. An IEP team meets and writes the IEP considering the strengths of the child, the concerns of the parent, and the most recent evaluation of the child. *Id.* at (3). As to hearing impaired children, the IEP team is to:

> (iv) consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel

in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and

(v) consider whether the child requires assistive technology devices and services.

*Id.* The IEP team is to be composed of the child's parents, at least one special education teacher of the child, a specialist in developing curriculum from the local district, and at the request of the parent or the school district, anyone with special knowledge or expertise related to the child's education. *Id.* at (1)(B).

In addition to the general requirements set out in the IDEA, state and federal regulations detail the implementation of the statute. *See, e.g.*, 34 C.F.R. § 300.340-300.350 (setting out requirements for IEP); N.J.A.C. § 6A:14-1.3 (defining IEP). New Jersey's requirements for developing an IEP follow the federal requirements. *Fuhrmann v. East Hanover Bd. Educ.*, 993 F.2d 1031, 1035 (3d Cir. 1993). The regulations require a child study team (CST) evaluate the child. The members of the CST are a school psychologist, a learning disabilities teacher-consultant, and a school social worker. N.J.A.C. § 6A:14-3.1. The CST, parents, a teacher familiar with the student, and other appropriate personnel then meet. N.J.A.C. § 6A:14-2.3. Members from this group then work together to formulate, review, or revise the child's IEP. 34 C.F.R. § 300.344-300.345; N.J.A.C. § 6A:14-2.3.

The IEP team is required to review the IEP at least annually to determine whether the child is reaching the stated goals. In addition, the IEP team is to revise the IEP to address lack of progress, necessary changes arising from reevaluation of the child, and parental input, among other things. 20 U.S.C. § 1414(1)(A)(4).

In addition, the IDEA includes a mainstreaming component in its description of a free and appropriate education, requiring education in the least restrictive environment. *See* 20 U.S.C. § 1412(a)(5)(A).[1] We have

---

1. The IDEA describes "least restrictive environment" as:

In general. To the maximum extent appropriate, children with

interpreted this mainstreaming requirement as mandating education "in the least restrictive environment that will provide [her] with a meaningful educational benefit." *T.R. v. Kingwood Township Bd. Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995).

The issue here is not whether I.H. should receive special education, nor is it whether the School District afforded her due process. Rather, the only issue is whether the School District's proposed IEP, changing I.H.'s placement, would provide her a meaningful educational benefit. *Ridgewood*, 172 F.3d at 247.

### B.   Factual Background

The Appellant, S.H., brings this appeal individually and on behalf of her daughter I.H. I.H. has severe to profound sensorineural hearing loss. When she was two years old, the Newark Public School District identified I.H. as eligible for its preschool handicapped program. After determining that there was no suitable program in I.H.'s home School District, the School District placed I.H. at the Lake Drive School for Deaf and Hard of Hearing Children. I.H. began attending Lake Drive School in the summer of 1997 when she was three years old.

The Lake Drive School is a public school outside the Newark School District. In justifying this placement, the

---

disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

School District noted that I.H. required a special program unavailable in her home district. Specifically, she required a small, specialized, and highly structured education program tailored to her functioning levels, hearing impairment, and specific sensory deficit. This program would provide "developmentally appropriate curriculum, teachers specialized in working with hearing-impaired children, presentation of auditory training, sensory utilization skills and facilitation of communication skills." *S.H. v. Newark Bd. Educ.*, No. EDS7639-99, at 3 ¶1 (N.J. OAL, Oct. 4, 1999) *available at http:// lawlibrary.rutgers.edu/oal/word/initial/eds7639-99-1.doc*

The School District developed a new IEP the next year, revisiting I.H.'s placement. This IEP specified placement at the Bruce Street School for the Deaf in Newark beginning in September 1998. The Bruce Street School is a self-contained school for the deaf placed within a larger school, the George Washington Carver School. This is the neighborhood school that I.H. would have attended if she had not been hearing impaired. The Bruce Street School was available for I.H.'s initial placement in 1997, and the School District explains neither why it was not appropriate for the initial placement, nor what changed in the interim making it appropriate.

S.H. challenged the School District's change in I.H.'s placement. Following mediation, I.H. was allowed to remain at the Lake Drive School. As a result, I.H. attended the Lake Drive School preschool handicapped program from 1997 to 1999. An interim IEP developed in January 1999 also resulted in I.H.'s continuing placement at Lake Drive School. The Lake Drive School's evaluations of I.H. conducted in January 1999 concluded that she should remain in the school for summer school and the 1999-2000 school year.

In the spring of 1999, the School District reevaluated I.H. to decide the appropriate placement for the 1999-2000 school year, the year she would start kindergarten. In this June 1999 proposed IEP, the School District found that the least restrictive environment for I.H. was the Bruce Street School for the Deaf. In finding that it was the least restrictive environment, the School District noted that

Bruce Street School is near I.H.'s home, and differs from Lake Drive in that I.H. could have interaction with nonhandicapped children between classes (e.g., lunch and recess). Because she wanted I.H. to continue attending school at Lake Drive, where the District initially placed I.H., S.H. requested a due process hearing challenging I.H.'s placement for the 1999-2000 school year.

## C. Procedural History

### 1. ALJ Decision

New Jersey's process for resolving disputes arising in special education cases starts with mediation. N.J.A.C. § 1:6A-4.1. If mediation fails, the case is forwarded to the Office of Administrative Law and assigned to an Administrative Law Judge (ALJ). After the hearing, the ALJ has forty-five days to issue his decision. There is no additional review under New Jersey's administrative system, and the case can be directly appealed to New Jersey superior court or federal district court. N.J.C.A. § 1:6A-18.1-18.3.

At the administrative hearing, S.H. sought to have I.H.'s placement continue at the Lake Drive School for the 1999-2000 school year. The ALJ held hearings for three days, received evidence from both the School District and S.H., and heard testimony from several witnesses for both parties. In his opinion, the ALJ made extensive factual findings. The ALJ had before him multiple evaluations of I.H, including Lake Drive School's annual review prepared in January, and the School District's June proposed IEP. The ALJ made his factual findings based on these reports, in addition to other documentary evidence, and the testimony of several witnesses.

The primary witness for S.H. was Dr. Laura McKirdy, the principal at Lake Drive School. Besides being principal of Lake Drive since 1978, Dr. McKirdy is a speech language pathologist and developmental psychologist, and is a certified elementary school teacher. The ALJ accepted Dr. McKirdy as an expert on deaf education based on her training, education, and experience. The ALJ heavily relied

on the testimony of Dr. McKirdy in reaching his decision. Explaining this, he noted:

> In this particular matter, as in most, the credibility and persuasiveness of the testimony is of paramount concern. While I found all of the witnesses who testified were credible, I was most persuaded by the testimony of Dr. McKirdy. With regard to her resume, suffice it to say that she is impeccably credentialed in the area of deaf education. However, her credentials did not form the entire basis of my decision to give controlling weight to her testimony — it was the manner in which she testified. It was abundantly clear to me, after listening to her on both direct and cross-examination and comparing her responses to those of the other witnesses, that no one connected with the hearing knew more about deaf education than she. Furthermore, her knowledge of I.H., while admittedly not as personal as others who may have testified, was sufficiently informed to lead me to conclude that her opinions took into account I.H.'s unique needs.

*S.H. v. Newark Bd. Educ.*, No. EDS7639-99 at 10.

Both parties and the witnesses agreed that I.H. was a good student, and was making progress toward her educational goals. In his decision, the ALJ summarized the conclusions from the Lake Drive School's evaluation. The Lake Drive evaluation recommended continuing speech and language therapy of four thirty-minute-sessions a week. The evaluation found that I.H.'s progress was directly related to the frequency and planning of the speech and language programs. Lake Drive's review concluded that continuing I.H.'s "tightly structured" program was necessary for her language development.

The ALJ contrasted Lake Drive School's comprehensive evaluation to the proposed IEP. It is through the IEP that the School District must prove that it will confer a meaningful educational benefit on I.H. in transferring her to Bruce Street. The School District carries the burden of showing this IEP is appropriate. *See, e.g.*, *Fuhrmann*, 993 F.2d at 1034-35 ("[I]t is quite clear that when a change in a child's IEP is sought, regardless of whether the party

seeking the change is the school district or the parents, the burden of showing that the placement is 'appropriate' rests with the school district.").

A Child Study Team (CST) from Bruce Street developed the June proposed IEP. Although the CST that placed I.H. in the Lake Drive School in 1999 was also from the Newark School District, the members of each team were different.[2] The CST drafted the proposed IEP after observing I.H. both in and out of Lake Drive School. However, the ALJ found that the School District drafted the IEP with little or no input from the staff at Lake Drive. In his findings of fact, the ALJ noted several deficiencies in the IEP. Because the ALJ heard the witnesses and weighed the evidence in light of their testimony and credibility, reviewing these factual findings is instructive.

The ALJ noted that the proposed IEP failed to recognize that I.H. retained some residual hearing in her left ear. Testimony before the ALJ suggested that this residual hearing might be used to help I.H. develop some understandable oral communication. The ALJ found this omission from the IEP to be significant. The proposed IEP also failed to reference the appropriate standardized tests for evaluating I.H. The test noted in the IEP was not normed for hearing impaired children as young as I.H.

The ALJ considered the "supplementary aides and services and instructional modifications" in the proposed IEP and found them to be inappropriate for I.H. The IEP specified the use of the "Kendall Demonstration Elementary School Curriculum." However, the ALJ found that the Kendall Curriculum are guidelines for a curriculum, not a curriculum; that they may be outdated; and, since not developed for New Jersey, that they may be inappropriate for enabling deaf children to compete academically in New Jersey. Instead, the ALJ found that the appropriate curriculum would focus on New Jersey's educational requirements and standards. In contrast, the Lake Drive School uses New Jersey standards and materials for the education of hearing impaired children.

---

2. Perhaps explaining why the current CST could not explain why the School District initially placed I.H. at Lake Drive School.

Although the School District placed much emphasis on Bruce Street as the least restrictive environment because it offered extracurricular activities, the ALJ found that the proposed IEP did not support this assertion. Specifically, the proposed IEP noted that I.H. would be able to participate in "art with sign interpreter." However, the ALJ found that I.H. would receive little benefit from this art class because focusing on both the teacher and the sign interpreter, and understanding that the message and deliverer are distinct, is difficult for young deaf children. In comparison, the art teacher at Lake Drive is a fluent signer. The School District emphasized the "mainstreaming" opportunities available at Bruce Street, but the ALJ found the "mainstreaming" provided at Bruce Street to be *de minimis* at best. The students are segregated for classes, and although they attend assemblies and recess with hearing children, they are further segregated by the uniforms the Bruce Street children wear, which differentiate them from the rest of the Carver School children.

Lake Drive's evaluation of I.H. suggested that she needed to participate in an extended school year (summer school). The ALJ found that for I.H., the extended school year was particularly important in her language acquisition. The proposed IEP did not call for an extended school year. In addition, the ALJ found that the proposed IEP lacked many specifics necessary to find that it would confer a meaningful education benefit on I.H.

Finally, the ALJ found that the School District failed to prove that the "total communication" philosophy employed at Bruce Street would confer a meaningful benefit to I.H. Total communication is a process of incorporating all means of communication with the children, which in practice can differ between institutions. The ALJ accepted the testimony that consistent use of signs and word order was important for teaching I.H. The total communication practiced at Bruce Street is apparently different from that used at Lake Drive, and to the extent that they are different, the ALJ found that it would be detrimental to I.H. Based on his extensive factual findings, the ALJ concluded that the School District did not prove "by a preponderance

of the credible evidence that it can provide I.H. with an appropriate education." *S.H. v. Newark Bd. Educ.*, No. EDS7639-99 at 11.

### 2.   District Court Proceedings

The ALJ issued his decision on October 4, 1999. S.H. went to U.S. District Court seeking fees for the cost of the administrative action on May 24, 2000. On June 8, 2000, eight months after the ALJ's decision, the School District filed an answer and counterclaim, for the first time challenging the ALJ's decision. The matter was referred to a Magistrate Judge on cross-motions for summary judgment. In recommending a decision, the Magistrate Judge took no new testimony.

In his recommendation, the Magistrate Judge reviewed the facts and arguments of the parties, and summarily rejected the testimony of Dr. McKirdy, whose testimony the ALJ found most persuasive and credible. After recognizing that the standard of review called for giving due weight to the ALJ, the Magistrate Judge conducted a one-paragraph "analysis":

> On the record before me, I conclude that the defense motion should be granted. I recognize that "due weight" must be afforded to the Administrative Law Judge's determination. But even granting that weight, I believe the Court's independent judgment based on a preponderance of the evidence requires a determination that the Administrative Law Judge in this case simply "got it wrong." It is entirely clear to me that a free and appropriate public education will be provided at the Bruce Street School while affording the least restrictive environment for I.H., as mandated by the applicable law. . . . In short, I find the defendant District's arguments more persuasive in this case.

*S.H. v. State-Operated Sch. Dist. of Newark*, No. 00-2559, Mag. R & R. at 18-19 (D. N.J. Mar 13, 2001).

The District Court adopted the conclusion of the Magistrate in a letter opinion. In adopting the recommendation, the District Court added little to the

Magistrate Judge's recommendation. It found that Bruce Street was the least restrictive environment because of its proximity to I.H.'s home and its opportunities for interaction with nondisabled children. In addition, the District Court noted that the CST members evaluated I.H. and recommended that she attend Bruce Street.

## II.

### A. Issues

On appeal, S.H. argues that the District Court did not afford the ALJ proper deference as to his findings of fact. S.H. also challenges the District Court's conclusion that the proposed IEP would confer a meaningful educational benefit. Finally, S.H. questions whether the School District's counterclaim appealing the ALJ decision was timely.

### B. Standard of Review

We exercise jurisdiction over IDEA cases pursuant to 20 U.S.C. §1415. Our review of the legal standard the District Court applied is plenary. *See T.R.*, 205 F.3d at 576. District Courts are to give due weight to the factual findings of the ALJ in IDEA cases. We have outlined the meaning of "due weight" through several cases, although we have not definitively addressed what constitutes "due weight." *See Susan N.*, 70 F.3d at 758; *see also Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 591-92 (3d Cir. 2000) ("We must give 'due weight' to the underlying state administrative proceedings. . . . [A]lthough we must consider administrative fact findings, we have not interpreted *Rowley* as requiring us to accept such findings."); *D.R. v. East Brunswick Bd. Educ.*, 109 F.3d 896, 898 (3d Cir. 1996) ("The Third Circuit has interpreted the Supreme Court's instruction in *Rowley* to require that a court consider— although not necessarily to accept—the administrative fact findings."); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1996) ("[A]lthough the district courts must consider the administrative findings of fact, they are free to accept or reject them. . . . But if the district court chooses to depart

from the agency's ruling, it should provide some explanation for its departure.").

In *Susan N.*, we noted the Tenth Circuit's description of the "due weight" requirement as "modified *de novo* review." 70 F.3d at 758 (citing *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995)). Since then, several other cases have elucidated the contours of "due weight," and described the standard of review as "modified *de novo* review." Under the IDEA, the reviewing court "is obliged to conduct a modified *de novo* review, giving 'due weight' to the underlying administrative proceedings." *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted). Factual findings from the administrative proceedings are to be considered prima facie correct. *Id.* at 531. "[I]f a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *Id.* (citations omitted).

Although we have not referred to the proper standard of review as modified *de novo* before, our cases call for this standard. In discussing Pennsylvania's two-tier system of administrative review in IDEA cases, we stated that the appeals panel "should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle*, 62 F.3d at 529. A federal district court reviewing the administrative fact finder in the first instance is similarly required to defer to the ALJ's factual findings unless it can point to contrary non-testimonial extrinsic evidence on the record.[3]

In *Oberti v. Board of Education of the Borough of the Clementon School District*, we noted that where the District Court hears additional evidence it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether

---

3. Under the IDEA, the District Court could have taken additional evidence. 20 U.S.C. §1415(e)(2). This case concerns those situations where the District Court did not hear additional evidence and based its decision on the factual record as developed at the administrative level.

they are consistent with the requirements of the Act." 995 F.2d 1204, 1220 (3d Cir. 1993). In contrast, where the District Court does not hear additional evidence it must find support for any factual conclusions contrary to the ALJ's in the record before it. Moreover, the court must explain why it does not accept the ALJ's findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews. *See Susan N.*, 70 F.3d at 757.

In addition to the Tenth Circuit and Fourth Circuit's use of the modified *de novo* standard, the Sixth Circuit has described the appropriate standard of review as modified *de novo* as well. *See Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) ("According to this 'modified' *de novo* standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings."). We agree with these other courts that the appropriate review of the administrative hearing is modified *de novo.*

### III.

#### A.   Application of modified *de novo* review

In cases where we have upheld a District Court's decision to overrule the administrative fact finder, the District Court has fully explained its reasons for departing from the state decision. For example, in *Wexler v. Westfield Board of Education,* "The district court, in a very thorough opinion, analyzed the evidence in a responsible and sensitive fashion. It reviewed all the test results, and all the administrative proceedings, including the transcripts and reports. Its findings are detailed and supported by the evidence." 784 F.2d 176, 181 (3d Cir. 1986). Similarly in *Geis v. Board of Education,* we noted that "In a thorough opinion, the district court [made an independent determination based on a preponderance of the evidence], specifically citing the evidence in its record and the administrative record that supported its conclusion, as well

as discussing the conflicting evidence." 774 F.2d 575, 583 (3d Cir. 1985). In *Oberti*, the District Court held a three day trial and took new evidence before concluding that the ALJ erred. 995 F.2d at 1210.

In contrast, the Magistrate Judge here concluded that the ALJ "simply got it wrong." Although the report and recommendation adopted by the District Court does set forth the arguments from the School District and S.H., it does not explain why the District Court reached the conclusion that the ALJ "simply got it wrong." The District Court did not address any of the extensive factual findings noted above regarding the deficiencies with the proposed IEP. Under the modified *de novo* standard of review, this does not accord sufficient deference to the factual conclusions of the ALJ.

## B.   Appropriateness of IEP

The issue of whether an IEP is appropriate is a question of fact. *Carlisle*, 62 F.3d at 526. Even if the District Court applied the wrong standard of review, we may still uphold its decision if correct under the appropriate standard of review. *See T.R.*, 205 F.3d at 577 (finding that although the district court applied the wrong test, its decision could nevertheless be upheld under application of the correct standard.). We review the decision of the ALJ under the modified *de novo* standard, giving due weight to the ALJ's decision. The issue is the appropriateness of the IEP changing I.H.'s placement to the Bruce Street School, and the burden is on the School District. We will defer to the ALJ's credibility determinations unless countered by non-testimonial evidence on the record.

As discussed above, the ALJ noted several deficiencies in the proposed IEP. Taking the ALJ's factual findings as prima facie correct, we must decide whether the record contradicts those factual findings. As the School District correctly points out, the issue is not a comparison between the Lake Drive School and the Bruce Street School. The IDEA does not require the School District to provide I.H. with the best possible education. However, the School District does not meet its burden by simply showing that

an appropriate program may be available. Instead, the School District must show that the proposed IEP will provide I.H. with a meaningful educational benefit. This is an individual determination personal to I.H. *See Ridgewood*, 172 F.3d at 248 (determining the appropriateness of an IEP requires "a student-by-student analysis that carefully considers the student's individual abilities."). The Lake Drive School and its program are only an issue as far as they relate to I.H.'s specific situation. Here, the School District initially placed I.H. in the Lake Drive School. Now, one factor of I.H.'s individual situation is her placement at Lake Drive. In other words, if a change in her placement will be detrimental, this is a factor in determining whether the new placement will achieve a meaningful educational benefit.

### 1. Least Restrictive Environment

The School District premises much of its argument on the idea that Bruce Street is the least restrictive environment (LRE). The ALJ found that although Bruce Street is contained within a neighborhood school with nondisabled children, its mainstreaming opportunities were actually *de minimis*.

We have adopted a two-part test for determining whether a School District complies with the LRE requirement. The first step is for the court to determine whether the school can educate the child in a regular classroom with the use of supplementary aids and services. If, as here, the child cannot be educated in a regular classroom, the next step is to decide whether the school is mainstreaming the child to the maximum extent possible. *Oberti*, 995 F.2d at 1215. Before we reach this two-part test though, we note that the child must be educated in the LRE that will *provide a meaningful educational benefit. See T.R.*, 205 F.3d at 578.

In *Carlisle*, we noted that the LRE would ideally be the same school the child would have attended if she were not disabled. 62 F.3d at 535. However, we prefaced that statement by noting that such placement is only appropriate to the extent that it "satisfactorily educates" the disabled child. *Id.* The School District and District Court's

emphasis on the LRE requirement here is misplaced. The School District must first prove that the IEP will provide a meaningful educational benefit. The School District cannot bootstrap the meaningful educational benefit with the LRE requirement. The "IDEA requires that disabled students be educated in the least restrictive *appropriate* educational environment." *Ridgewood*, 172 F.3d at 249 (emphasis added). If the educational environment is not appropriate, then there is no need to consider whether it is the least restrictive.

Even considering the mainstreaming opportunities the School District points to, we agree with the ALJ that they are *de minimis.* Other than potential interaction at lunch or recess (in a uniform segregating the Bruce Street students from the nondisabled students), the School District points to art with sign interpreter and "after school sports with late bus" proving Bruce Street is the LRE. App. at A458. The LRE should be considered in light of I.H.'s specific educational needs. *Geis v. Bd. Educ.*, 774 F.2d 575, 583 (3d Cir. 1985). As the ALJ noted, art with sign interpreter would provide almost no educational benefit to I.H. Therefore, any value from mainstreaming is marginal. As to the "after school sports with late bus," the School District does not detail to what extent I.H., in kindergarten, would even be able to use this program.

## 2.   Meaningful Educational Benefit

Taking each deficiency noted by the ALJ in turn, the evidence on the record does not overcome the ALJ's factual conclusions. For several deficiencies, the School District does not present any rebuttal and none can be found in the record. The proposed IEP does not address I.H.'s residual hearing, nor does the School District explain why the ALJ's finding that this is a significant omission is incorrect. The IEP refers to use of the Stanford Achievement Test "normed on the Hearing Impaired." App. at A455. The School District does not rebut Dr. McKirdy's statement that the SAT is not an appropriate test for determining I.H.'s performance levels, as the test is not normed for children younger than eight.

The proposed IEP recognizes that I.H.'s progress may suffer without an extended school year. App. at A463 ("Hearing-impaired children lose a great deal of academic ground during the summer months . . . when they are not in a structured, academic setting."). Nevertheless, the proposed IEP does not address extended school year services.

The ALJ found that consistent use of signs, specifically relating to the word order used and the use of connecting words and word endings, was one of the most important aspects of teaching I.H. English. *S.H. v. Newark Bd. Educ.*, No. EDS7639-99 at 9-10, ¶ 34-36. A thorough review of the record supports the ALJ's conclusion that the School District did not prove by a preponderance of the evidence that the communications methods of Bruce Street and Lake Drive are the same. The parties agree that both schools adhere to the "total communication" philosophy. The evidence in the record does not rebut the ALJ's conclusion that the execution of the total communication philosophy was different between the two schools. Dr. McKirdy testified that Lake Drive stresses the use of connecting words and word endings because those words are easily missed.[4] The school stresses consistency between teachers and classes to assure that the appropriate signs are used. In addition, Dr. McKirdy testified that the school strives for consistency with words for which there is not a formally accepted sign. The School District's witnesses testified that Bruce Street employs the same philosophy of total communication, but did not contradict the ALJ's conclusions that there may be significant differences in the details of the language used. Coupled with the ALJ's finding that I.H. is at an important stage in her language acquisition, the record supports the

---

4. Dr. McKirdy gave the following example in her testimony: "putting the s on the end of a word, three balls, plus the plural marker on the end, you would mark a past tense, you would mark . . . good, better, and best, so that the er, est endings on an adjective so that you're giving clues for that. Like a sentence, he walks the dog, versus he walked the dog, has hugely different meaning, which you use a signed marker to show that it's either active or happened in the past."

App. at A276.

ALJ's conclusion that differences in the program may be detrimental to I.H.

The non-testimonial evidence on the record does not contradict the ALJ's factual findings. Therefore, we accept them as correct. In light of his factual findings, the ALJ's conclusion that the School District did not prove by a preponderance of the evidence that the proposed IEP would convey a meaningful educational benefit is not in error.

## C.   Timeliness

S.H. also challenges the timeliness of the School District's challenge to the ALJ's decision. The District Court did not address this issue. The IDEA does not contain a statute of limitations relating to these suits. In *Tokarcik v. Forest Hills School District*, 665 F.2d 443 (3d Cir. 1981), we decided that, under Pennsylvania law, either a two-year or six year statute of limitations applies. We have followed this decision in later cases. *See, e.g.*, *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 280 (3d Cir. 1996). In *Ridgewood*, we held that the appropriate statute of limitations for a parent to appeal an adverse administrative decision under the IDEA in New Jersey is two years. 172 F.3d at 251. We have also held that the time to initiate the administrative procedure is a question of equity and that the parents must initiate proceedings within a reasonable time. *Bernardsville Bd. Educ. v. J.H.*, 42 F.3d 149, 157-60 (3d Cir. 1994).

S.H. suggests that we should extend this equitable principle to determining the appropriate time for the school to appeal from an adverse administrative decision. S.H.'s concerns are understandable. New Jersey clearly seeks prompt settlement of these disputes by imposing a 45-day limit on the time the ALJ may take to decide. Here, the ALJ promptly issued a decision as to the 1999-2000 IEP early in the school year. It was not until May 26, 2000 that S.H. sought attorneys' fees. This was after the May 16, 2000 IEP development meeting for the 2000-01 school year where the School District apparently suggested continuing placement at Lake Drive. Only after S.H. sought attorneys' fees did the School District challenge the ALJ's decision. Nevertheless,

we are not inclined to parse our earlier decisions in an attempt to carve out a new statute of limitations here.

While we do not adopt S.H.'s suggestion to impose a shorter statute of limitation, we do note that the School District's delay should have an impact on the remedy. The School District suggests that if we uphold the ALJ's decision that the IEP is inappropriate, the proper remedy is to allow it to revise its IEP to properly address the placement at Bruce Street. Were we to follow the School District's suggestion, we would strip the attorney fee provisions of the IDEA of any effectiveness in similar cases. We are addressing only the 1999 proposed IEP. If the School District can "correct" the IEP in 2003 (or any time after the 1999-2000 school year) and then claim that the student has not prevailed, plaintiffs in these cases could never recover attorneys' fees. This is clearly not the intention of Congress in providing for attorneys' fees in the IDEA. Had the School District promptly appealed the case following the ALJ decision, and had it lost, it may have been able to present an IEP showing that I.H. would receive a meaningful educational benefit at Bruce Street.

## IV.

The School District did not prove by a preponderance of the evidence that the proposed IEP would afford I.H. with a free and appropriate education. Therefore, the judgment of the District Court in favor of the School is reversed and we remand this case with instructions to enter judgment in favor of S.H.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*