**N.M., a minor, by and through his parents, M.M. and L.M., and on their own behalf, Plaintiffs,**

**v.**

**SCHOOL DISTRICT OF PHILADELPHIA, Defendant.**

**Civil Action No. 08cv1162.**

United States District Court, E.D. Pennsylvania.

Nov. 9, 2008.

Leslie Marrant, Esq., Philadelphia, PA, for Plaintiffs.

Office of General Counsel, Philadelphia School District, by Miles H. Shore, Esq., Philadelphia, PA, for Defendant.

## OPINION

IRENAS, Senior District Judge:

Plaintiffs, L.M. and M.M., individually and on behalf of their minor son, N.M., bring this Individuals with Disabilities Education Act ("IDEA") suit, 20 U.S.C. §§ 1400–1491, against Defendant, Philadelphia School District (the "School District"). Plaintiffs assert that Defendant failed to provide N.M. with a free and appropriate public education. They seek tuition reimbursement for their unilateral placement of N.M. in private school for the 2007–2008 school year.[1]

Defendant moves for judgment on the administrative record. Plaintiffs move for summary judgment. For the reasons stated herein, Defendant's Motion will be granted and Plaintiffs' Motion will be denied.[2]

### I.

At the time the present dispute arose—prior to the 2007–2008 school year—N.M. was eight years old. He had never been a student in a "regular education"[3] class-

---

1. The Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1415(I).

2. Within the Motion for Summary Judgment, Plaintiffs also moved the Court for leave to submit an over length brief. That motion will be granted. The Court has considered all of Plaintiffs' submissions in reaching its decision.

3. The Court uses this term because it was the term used by the parties during the due process hearing.

room; indeed, he had never attended a public school. Rather, N.M., spent the past two school years (kindergarten and first grade) at Stratford Friends School, a private school for children with "various learning differences, mostly language-based learning differences." (Due Process Hearing Transcript, hereafter "Tr.", at p. 22, Testimony of Timothy Madigan [4]) Defendant paid N.M.'s tuition both years.[5] The parties do not dispute N.M.'s eligibility for services.

The administrative record demonstrates, and the parties generally do not dispute, that N.M. faces serious challenges in receptive and expressive language skills. He also has impairments in auditory processing and socialization, and has difficulty with inattentiveness and distractibility.[6]

Specifically, the most recent evaluation of N.M., conducted in March, 2007, by Dr. Auritt, on behalf of Defendant, observed the following:

> Results have consistently shown that [N.M.] presents with a mixed receptive-expressive developmental language disorder and that he does not show evidence of Mental Retardation.[7] Although most evaluations have ruled out Autistic Disorder, there has been some indication that he may have Pervasive Developmental Disorder–Not Otherwise Speci-

fied.[8] [N.M.'s] teachers were interviewed, and they report that he has made significant progress, although the interrelationship of attention, memory and language continued to be a concern. . . . Previous evaluations have noted his need for 'social modeling' as part of his program, but he is currently in a class totally comprised of students with special needs, and observations failed to note any evidence of meaningful interactions between [N.M.] and any other child. . . . Observations indicate that expressive language issues and attentional problems continue to be present. Although it is questionable whether [N.M.] meets the criteria for PDD–NOS, it would not be appropriate to change this diagnosis based on the limited scope of this reevaluation. . . . [B]ecause [N.M.] presents with a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken, or written, . . . he meets criterial for a diagnosis of Specific Learning Disability.

(Plaintiffs' Ex. 7)

The report gave six recommendations:

> 1. [N.M.] is eligible for, and in need of, placement in a Learning Support pro-

---

4. Dr. Madigan, who testified on Plaintiffs' behalf, is the board chair of Stratford Friends School.

5. Plaintiffs' brief in support of their instant motion indicates that both tuition payments were the result of settlement agreements resulting from due process proceedings initiated by Plaintiffs. (Pls' Opening Brief, p. 5–6)

6. N.M. was subsequently diagnosed with ADHD, however, Defendant was not aware of that particular diagnosis at the time the IEP at issue was created.

7. A previous evaluation had concluded that N.M.'s IQ was "within the Average or age-appropriate range." (Plaintiffs' Ex. 2)

8. As Dr. Auritt's report notes, Pervasive Developmental Disorder–Not Otherwise Specified (PDD–NOS) is a diagnosis "below the cut-off for autism," but is on the spectrum of autistic disorders. (Plaintiffs' Ex. 7) N.M.'s score on the relevant test " 'did not reach the cutoff provided by the test authors for Autism Spectrum Disorder and was thus much below the cutoff suggested for a diagnosis of Autism (the more severe end of the spectrum). Rather his score was on the borderline for Autism Spectrum Disorder, suggesting that he does demonstrate a pattern of needs in terms of communication skills, reciprocal social interaction skills, and atypical behaviors and that the severity is subthreshold for full diagnosis.' " (*Id.*)

gram because of a Specific Learning Disability.

2. His program should provide him with intensive multi-sensory, structured, language-based instruction that offers him rigorous instruction commensurate with his average ability to learn.

3. Skills should be introduced with many repetitions for mastery.

4. [N.M.] should be provided with opportunities for demonstrations, modeling, and guided practice.

5. [N.M.] should be provided with opportunities to interact with nonhandicapped students to enable him to have social modeling experiences. Removing him from a regular school environment may be counterproductive to developing age appropriate skills. [N.M.] should spend at least part of the day interacting with non-disabled peers in the regular education setting.

6. His program should include social skills training.

(Id.)

Additionally, an Auditory Processing evaluation of N.M., also conducted in March, 2007, revealed "an auditory processing disorder, specifically a deficit in the area of decoding." (Plaintiffs' Ex. 8) The report made the following recommendations:

1. ... [N.M.] can be expected to have more than average difficulty with verbal conversation in the presence of background noise. Therefore, extraneous noise should be minimized in order to give [N.M.] the best possible signal to hear and understand others. When in the classroom [N.M.] should be given preferential classroom seating in order to best hear his teachers.

2. [N.M.] should consider the use of programs such as Fast Forward and Earobics to improve his phonemic understanding....

3. Individuals exhibiting a decoding deficit tend to require a slower and clearer signal in order to obtain the best possible understanding. [N.M.'s] family and teachers should use slower and clearer speech, especially in situations where there is extraneous noise, to enable him to understand better.

4. [N.M.] will also benefit from multimodal learning strategies.... Presenting information to [N.M.] both visually, by writing information down, and auditorily will help facilitate his comprehension of the topic.

5. As [N.M.] gets older the use of a note taker in the classroom will benefit him.

6. Repetition and redundancy of information will aid [N.M.] in following conversations in situations where he has difficulty understanding others.

(Id.)

N.M.'s proposed IEP for the 2007–2008 school year, the IEP at issue (Defendant's Ex. 7), principally relied on these two evaluations in crafting a program to meet N.M.'s needs.

The IEP contemplates that N.M. would split his classroom time between a special education "Learning Support" classroom, and a "regular education" classroom. In both classrooms, N.M. would receive one-to-one support from an assistant "to assist with transitioning, distractibility, and language processing." (Id.) It also provides for "Modifications" and "Specially Designed Instruction (SDIs)," specific to discrete goals in literacy, math, and speech-language. Other general accommodations are prescribed to apply across the board. Insofar as relevant here, the IEP sets out the following specific SDIs:

Literacy

● preferential seating arrangement

- computer based reading intervention such as Earobics, Fast ForWord, and Read 180
- multisensory instructional program moving step by step from simple to more complex material in a sequential, logical manner through visual, auditory, kinesthetic, and tactile strategies and approaches
- use of kinesthetics (tapping out individual phonemes in a word) in decoding practice
- small group instruction for structured decoding program

Speech–Language

- set up structured peer interaction opportunities
- engineer classroom environment so [N.M.] has appropriate opportunities to interact with peers
- visual, verbal and tactile cues for tongue placement
- small group instruction

Math

- simplified directions
- decoding of words upon request for mathematics and science
- oral practice for addition/subtraction facts (through music)
- preferential seating arrangement to address distractibility

(Id.) and the following general accommodations:

- gain [N.M.'s] attention before imparting verbal information
- provide multisensory input to facilitate attention/focus on classroom activities
- multisensory strategies to be used across all environments
- provide visual supports
- rephrase instructions, verbal prompting and modeling, slower rate of speech, repeat directions

(Id.)

Lastly, the IEP provides that teachers and staff working with N.M. will receive one-time "training in providing multisensory strategies, visual strategies and social skills training," and that a "collaborative dialogue and discussion [will occur] between the Orton Gillingham[9] trained teachers and other staffers who will work with [N.M.]." (Id.)

On August 23, 2007, L.M. formally rejected the proposed IEP, and requested a due process hearing. N.M. returned to Stratford Friends School for the 2007–2008 school year.

At the due process hearing, held on September 26, and October 10, 2007, Plaintiffs sought tuition reimbursement for the 2007–2008 school year, asserting that the proposed IEP failed to provide N.M. with a free and appropriate public education ("FAPE"). On October 31, 2007, the hearing officer issued a written decision, concluding that the IEP "offers [N.M.] the high level of services that he needs in order to make educational progress, and provides [N.M.] with academic support. The IEP is designed to address [N.M.'s] areas of identified need." (Decision of Hearing Officer, p. 10)

The hearing officer also concluded that "the Stratford Friends School is deemed inappropriate given that it fails to respond to the IDEA's least restrictive environment requirement." (Id. at p. 12) Accordingly, the hearing officer ordered that the School District was not obliged to pay for N.M.'s tuition at Stratford Friends School.[10]

---

9. Orton Gillingham is a particular method of MSSL instruction. It is used at Stratford Friends School. (Tr., p. 24)

10. Tuition for the 2007–2008 school year was $27,700.

Plaintiffs appealed to the Pennsylvania Special Education Appeals Panel, which affirmed the hearing officer's decision. This suit followed.

## II.

■ "When deciding an IDEA case, the district court applies a modified *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Ed.*, 435 F.3d 384, 389 (3d Cir.2006).[11] The Court must "defer to the ALJ's factual findings unless it can point to contrary non-testimonial extrinsic evidence on the record." *S.H. v. State–Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir.2003). The Court's decision is based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii).

■ "Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'" *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). The parties in this case are effectively seeking "a judgment on the administrative agency's record." *Id.* Although seeking judicial review of an administrative agency's decision by way of a summary judgment motion "is permissible under the IDEA, it is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial

based on a stipulated record." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir.1993).

## III.

### A.

■ Plaintiffs contend that Defendant failed to provide N.M. a "free and appropriate public education" ("FAPE") thereby entitling them to reimbursement for their unilateral placement of N.M. in Stratford Friends School during the 2007–2008 school year.

The IDEA provides:

(C) Payment for education of children enrolled in private schools without the consent of or referral by the public agency

(I) In general

... this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free and appropriate public education available to the child and the parents elected to place the child in such private school or facility.

(ii) Reimbursement for private school placement If the parents of a child with a disability, who previously received special education and related services under the authority of a

---

**11.** Plaintiffs assert that in this case, the Court should give less deference to the hearing officer's decision and apply a de novo standard of review. Plaintiffs point to the undisputed fact that, due to an inadvertent error, several of Plaintiffs' exhibits were never formally admitted into evidence at the due process hearing, even though they were considered during the hearing. Because of this apparent oversight, Plaintiffs filed with this Court a Motion to Supplement the administrative record. Defendants, also recognizing the oversight,

did not oppose the admission of those documents that should have been received in evidence. Thus, those documents are now properly part of the record before this Court and this Court has considered them. Given that there appears to be no dispute that this evidence was actually considered at the due process hearing the Court is skeptical that a less deferential standard of review is appropriate. In any event, the Court need not decide the issue because even under a de novo standard, the result would be the same.

public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free and appropriate education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(I)-(ii); *see also* 34 C.F.R. § 300.403 (same). Thus, when parents seek reimbursement for a unilateral private placement, the Court must first determine whether the School District provided the student FAPE by answering the question, "is the individualized educational program developed through the [IDEA's] procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Ed. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

 FAPE is an education that is "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034.[12] "The education provided must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children." *Ramsey Bd. of Ed.*, 435 F.3d at 390 (internal quotations omitted). The benefit conferred must be "meaningful," not merely "more than trivial." *Id.* Plaintiffs bear the burden of demonstrating that N.M.'s IEP did not provide him a FAPE.

*Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); *Ramsey Bd. of Ed.*, 435 F.3d at 391.

Before rejecting the 2007–2008 IEP, L.M. observed a representative regular education classroom and a learning support classroom. L.M.'s observations form the basis of her objections to the IEP. She testified at the due process hearing:

[N.M.'s] ability to comprehend [information] as you're teaching it to him is challenged, it is delayed. So in a regular education environment without what I consider appropriate accommodations to address—and I raised this at the IEP meeting, I said ... what are we going to do? You take this child out of this room and put him in learning support for reading and math ... what do you do when you put this child with the same auditory—his auditory processing delay doesn't leave, doesn't go away outside of that learning support classroom. It is a delay in processing. So as he's back in the regular education classroom for science, history, art and music, how are you accommodating that delay without significant modification ... and this is why I objected. He's got the delay. It doesn't go anywhere. And in a classroom with 28 kids ... how are you accommodating for that delay? It's accommodated at Stratford Friends. It is taught differently....

[I observed in the regular classroom] [a] group of children over in the corner doing some computers, they were loud.... [I]t was just eight year old activity. But ... because they were in small groups ... four to five kids per

12. *See also* 20 U.S.C. § 1401(9) ("The term 'free and appropriate public education' means special education and related services that— (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."); 34 C.F.R. § 300.13 (same).

group, there was a lot going on. It was for [N.M.] loud and somewhat distracting. There was a lot of movement and the children were working independently.... I have great concerns about that .... the noise level, the distractibility and then [N.M.'s] ability to sit down with another group of students.

... [T]he IEP calls for intensive and rigorous multisensory instruction.... Everyone has agreed and the phrase has been used repeatedly that [N.M.] needs intensive rigorous multisensory instruction, not some reasonable adaptation thereof.

And so I did not witness any multisensory strategies being utilized in either setting, the regular ed setting or the learning support setting ....

There was a teacher reading with some students and then the other students she was not working with were working at the computer.... If that is what has been proposed as, that is what has been proposed to me, I asked to see it, I looked at it, I went and observed. I don't believe that that type of instruction ... as is proposed for my son offers him intensive rigorous multisensory structured language instruction. Nor do I believe it can, that the program is set up that way nor the settings can accommodate that.

(Tr., p. 139–40; 146–47; 153–55) The Court addresses in turn each of the issues raised by L.M.'s testimony and reiterated by Plaintiffs' submissions to this Court.

**13.** The only other people to testify on Plaintiffs' behalf were L.M. and M.M.

**14.** Plaintiffs state that the Hearing Officer erred by failing to qualify Dr. Madigan as an expert. While the Hearing Officer declined to rule on whether Dr. Madigan was an expert, he allowed him to testify, answering each of Plaintiffs' counsel's questions over the objections of the School District's counsel. Even if

*Asserted inadequacy of MSSL instruction*

██ It is apparent from the administrative record that Plaintiffs' principal complaint lies with the School District's proposal to address N.M.'s undisputed need for "intensive multi-sensory, structured, language-based instruction" ("MSSL"). (Plaintiffs' Ex. 7) Plaintiffs contend that the IEP's provision for "multisensory strategies" across all environments, does not meet N.M.'s undisputed need for *intensive* and *rigorous* MSSL instruction. In essence, Plaintiffs assert that because the IEP does not propose that rigorous and intensive MSSL instruction be used "across the entire curriculum, across the entire school day," (as is done at Stratford Friends School) the School District's proposal is "wholly insufficient." (Pls' Opening Brief, p. 23–24)

The relevant inquiry however, is whether the IEP's provisions are reasonably calculated to enable [N.M.] to receive educational benefits; and importantly, Plaintiffs bear the burden of proof. Nothing in the record supports the conclusion that N.M. will not meaningfully benefit from the School District's proposal.

In support of their position, Plaintiffs rely on the testimony of Dr. Madigan,[13] who opined that the School District's IEP was inadequate because it did not "go[ ] far enough to support all of the needs that [N.M.] has." (Tr., p. 42)[14] With specific reference to the IEP's proposed "multisensory instructional program[15]" to be used "across all environments" for the "entire

there was a procedural violation, the Court fails to see how the violation could have prejudiced Plaintiffs.

**15.** The entire description reads, "multisensory instructional program moving step by step from simple to more complex material in a sequential, logical manner through visual, auditory, kinesthetic, and tactile strategies and approaches." (Def's ex. 7, p. 13)

school day," (Def's Ex. 7), Dr. Madigan expressed doubts as to whether the School District could successfully implement the proposal:

Q: Can you indicate for the record given your expertise in multisensory language based programs whether or not this indicates a full language based program or partial or something else?

A: This seems to indicate a reading program.

Q: Okay, and can you just distinguish for the record with a reading type program and the full-time multisensory language based program that [evaluators recommend for N.M.]?

A: Well, this because of what this calls for ... that's just a piece of it. And it's I guess the difficulty in answering your question is that it is not clear when everything is across all environments an entire school day .... it's not clear as to how this works. If you have several goals supposedly playing out across all environments in the entire school day, if he's going to be moving in and out of classes, the multisensory instructional program ... more than likely can't take place across an entire school day is he's moving in and out classrooms.

Q: And why not?

A: Well, because if he's going from a specialized class, which I would presume had fewer students to a general ed class that has more students, that's intense not only for the student, but also for the teacher, so I'm not sure the teacher with how many other students can instruct in this manner to meet [N.M.'s] needs.

(Tr., p. 48–49)

Crucially, however, Dr. Madigan did not state that the School District's proposal would not provide meaningful benefits to N.M.

Plaintiffs also believe that the School District's teachers are insufficiently trained in comparison with the teachers at Stratford Friends School. Specifically, the undisputed record shows that the School District's teachers have had some training in the Orton Gillingham method of MSSL. Plaintiffs rely on the undisputed fact that the teachers at Stratford Friends School have had more training in the Orton Gillingham method, thereby reasoning that the School District's training must be inadequate. However, Plaintiffs have put forth no evidence that the School District's training is inadequate—i.e., is not reasonably calculated to result in educational benefits—irrespective of the training of teachers at Stratford Friends School.

The hearing officer's and the appeals panel's determination that the proposed IEP is adequate is sufficiently supported by the record. N.M.'s evaluation recommends rigorous and intensive multisensory, structured, language-based instruction. The IEP proposes to meet that need through a "multisensory instructional program moving step by step from simple to more complex material in a sequential, logical manner, through visual, auditory, kinesthetic, and tactile strategies and approaches." This program is to be provided "across all environments" for "the entire school day." Moreover, the program is to be taught by teachers with training in the Orton Gillingham method of MSSL instruction. (*See* IEP at p. 28; Tr., p. 354–55; 392–93) Accordingly, the preponderance of the evidence supports the conclusion that N.M. would receive meaningful educational benefit from the School District's proposal for multisensory language instruction.

*Asserted failures to adequately address N.M.'s auditory processing needs*

Plaintiffs assert that the IEP does not adequately address N.M.'s auditory processing deficits because "the proposed IEP merely offers N.M. preferential seating in his classroom ... use of computerized phonic intervention, [and] a temporary

one-to-one aid." (Pls' Opening Brief, p. 28) However, Plaintiffs' argument ignores the other provisions of the IEP.

The IEP provides for "small group instruction for structured decoding program," "decoding of words upon request in math and science," and "rephras[ing] [of] instructions, verbal prompting and modeling, slower rate of speech, [and] repeat[ing] directions." All of these SDIs are to be provided across all environments for the entire school day. Additionally, the IEP calls for a one-to-one assistant to help N.M.'s language processing[16] with "the need for continuation of assistant *to be reevaluated following the first marking period.*" (emphasis added) Therefore, the use of the one-to-one assistant is not necessarily temporary.

Plaintiffs completely fail to address this evidence, much less carry their burden of demonstrating its inadequacy as a matter of law. Moreover, the preponderance of all the evidence supports the hearing officer's and appeals panel's conclusion that the IEP was adequate.

*Asserted failures to adequately address N.M.'s inattentiveness and distractibility*

Plaintiffs' argument as to N.M.'s inattentiveness and distractibility[17] similarly fails. Their argument completely ignores the IEP's provisions and instead relies solely upon the District's teacher's testimony that she would tap on N.M.'s paper if he needed to refocus on the task at hand.

However, the IEP contains the following provisions: "preferential seating arrangement to address distractibility;" and "one-to-one assistant in regular and special education setting to assist with transitioning [and] distractibility." Even Plaintiffs' own witness testified on direct examination that use of a one-to-one assistant "would avoid distractibility." (Tr., p. 54) Moreover, the IEP provides that N.M. would be in a special education classroom with fewer children for half the school day. Plaintiffs' witness also testified that a small classroom would help with "distractibility issues." (Tr., p. 62)

Plaintiffs fail to demonstrate how these accommodations are unlikely to produce meaningful educational benefits for N.M. The hearing officer's and appeals panel's decision is supported by a preponderance of the evidence.

*Other asserted deficiencies*

Lastly, Plaintiffs assert that the IEP does not include any provisions for easing N.M.'s transition from the special education setting to a regular classroom, nor does it address N.M.'s need for social skills training. Plaintiff's contentions are directly contradicted by the record.

With respect to social skills, the IEP directs that the School District will "[s]et up structured peer interaction opportunities" and "[e]ngineer [the] classroom environment so [N.M.] has opportunities to interact with peers." In order to facilitate progress in speech-language skills,[18] the

**16.** Dr. Auritt testified that N.M. "would be having a one-to-one assistant who would be helping him to modify his program.... That one-to-one could be summarizing what was said [by the regular classroom teacher], adapting the material so that [N.M. is] getting the concepts that are being taught." (Tr., p. 256–57)

**17.** While Plaintiffs reference N.M.'s later diagnosis of ADHD, it is undisputed that that diagnosis was not known to the School Dis-

trict when the IEP was created. Plaintiffs do not argue that the School District should have known of N.M.'s ADHD, rather they argue that the other information before the School District evidenced that N.M. had difficulties with attention and distractibility.

**18.** The specific goal is "will produce two contingent utterances about a context bound topic *when provided with conversational turn with a peer,* 80% of the time." (emphasis added)

IEP also calls for "role playing situations." Moreover, Dr. Auritt testified that placing N.M. in the general education classroom was an important component of allowing N.M. to learn how to interact with non-disabled peers. (Tr., p. 275–79)

Plaintiffs rely on Dr. Auritt's testimony that the IEP was "lacking" with regard to social skills training. (Tr., p. 286) However, Dr. Auritt's testimony on cross-examination must be read in context:

Q: But your concern in your own evaluation is that [N.M.'s] social skills be addressed?

A: That is correct.

Q: So your expert opinion is that it is appropriately addressed by simply placing him in a regular education classroom?

A: I think that would be part of the way.... I think there has to be direct emphasis on teaching him how to socialize with other children.

Q: Okay, and if the August 2007 IEP fails to address it in the way you just articulated, would you still believe that it provides [N.M.] with a free and appropriate public education?

A: I don't think it addresses that particular aspect of his needs.

Q: Okay, again, my question is ... do you still believe that that August 2007 proposed IEP provides [N.M.] with a free and appropriate public education on one of the needs that you evaluated he needs to have addressed, his social skills and it doesn't give him any?

A: I agree that that is lacking in the IEP.

Q: So my question is, yes or no, does it given [sic] lack provide [N.M.] with a free appropriate public education?

. . .

A: ... I believe the IEP is perfectly appropriate except for that particular aspect. I think it's lacking.

(Tr., p. 285–86)

The transcript demonstrates that Dr. Auritt implicitly accepted the erroneous assumption within the questions: that the IEP had no "direct emphasis on teaching [N.M.] how to socialize with other children." (Id. at 285) Because the IEP does directly emphasize social skills training, the hearing officer's and appeals panel's decision on this issue is supported by a preponderance of the evidence.

Moreover, nothing in the record supports the conclusion that the Stratford Friends School would meet N.M.'s social skills needs. Dr. Auritt testified that "[N.M.] needs to learn how to deal with the normal population. And in the population he's in right now [Stratford Friends School], he has almost no social models for him." (Tr., p. 277)[19]

With regard to transitioning N.M. from his environment at the Stratford Friends School to the half-time general education classroom environment proposed by the School District, Plaintiffs are incorrect that the IEP does not include provisions to aid in the transition. The IEP specifically

---

**19.** Plaintiffs' witness, Dr. Madigan, testified that every student enrolled in Stratford Friends School has a "learning disability or learning difference of some type." (Tr., p. 70) Before the hearing officer, Plaintiffs argued that N.M.'s after school program (not affiliated with Stratford Friends School) provided N.M. with the opportunity to interact with non-disabled students. However, the hearing officer concluded that the after school program "does not provide for the structured educational opportunities afforded by the District's second grade classroom." (Hearing Officer Decision, at 14) While Plaintiffs did not raise this argument before the appeals panel, and have not raised it before this Court, the Court notes that the hearing officer's decision is supported by Dr. Auritt's testimony. (See Tr., at 277–79)

states that the one-to-one assistant will help with transitioning.

Moreover, nothing in N.M.'s evaluations suggests that he will face any independent challenges in transitioning to the regular classroom. While N.M. may face challenges associated with his receptive/expressive language skills, auditory processing deficits, distractibility, and social skills, as already explained, those issues are adequately addressed in the IEP. Without a documented independent need for help with transitioning to a general education classroom, the conclusion that the IEP is adequate is supported by the preponderance of the evidence.

### B.

■ Alternatively, the Court holds that the hearing officer was correct in concluding that even if the IEP was inadequate, Plaintiffs were not entitled to reimbursement because Stratford School is not the least restrictive environment for N.M.

■ A court may award a disabled student the cost of his private placement if the student's IEP is inappropriate and the student demonstrates that the private placement he seeks is proper. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). "A private placement is proper if it (1) is appropriate, i.e., it provides significant learning and confers meaningful ben-

efit, and (2) is provided in the least restrictive educational environment." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (internal quotations and citations omitted).

Plaintiffs make no argument as to why Stratford Friends School is the least restrictive environment for N.M.; rather, they continually emphasize why the school's intensive MSSL instruction is appropriate for N.M. and why they believe the School District's proposal is inappropriate.[20] This Court has found no evidence in the record undermining the hearing officer's determination that Stratford Friends School was not the least restrictive environment for N.M.[21] Additionally, as discussed *supra*, the record evidence supports the hearing officer's conclusion that Stratford Friends School does not appropriately address N.M.'s social skills needs. Accordingly, tuition reimbursement must be denied for this alternate reason.

### IV.

The administrative decisions that (1) the School District's proposed IEP provides N.M. with FAPE, and (2) Stratford Friends School is not a proper placement, are supported by a preponderance of the record evidence. Accordingly, Plaintiffs are not entitled to tuition reimbursement. Plaintiffs' Motion will be denied; and Defendant's Motion will be granted. The Court will issue an appropriate order.

**20.** Plaintiffs apparently misapprehend the law in this regard, asserting that they need not address the least restrictive environment requirement because the School District's proposed placement is allegedly inappropriate. However, as stated *supra*, the inquiry is whether Stratford Friends School—the proposed private placement—is proper (i.e., appropriate *and* the least restrictive environment). In order to prevail, Plaintiffs must establish all three points: the inadequacy of

the School District's proposal, the appropriateness of the private school placement, and that the private placement is the least restrictive environment. *See Florence*, 510 U.S. at 15, 114 S.Ct. 361; *DeFlaminis*, 480 F.3d at 276.

**21.** The appeals panel did not reach the issue, which was an alternative holding by the hearing officer.

ORDER GRANTING PLAINTIFFS' MOTION TO FILE AN OVER-LENGTH BRIEF, DENYING PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

IRENAS, Senior District Judge:[1]

This matter having appeared before the Court upon Plaintiffs' Amended Motion for Summary Judgment[2] (Docket Entries 19/20) and Defendant's Motion for Judgment on the Administrative Record (Docket Entry 18); the Court having considered the parties' submissions; having issued an Opinion on even date herewith, which findings of fact and conclusions of law are incorporated herein by reference, And for good cause appearing,

IT IS on this 9th day of November, 2008,

ORDERED THAT:

(1) Plaintiffs' Motion to File and Overlength Brief is hereby **GRANTED** *nunc pro tunc,* effective the date of the motion's filing.

(2) Plaintiffs' Amended Motion for Summary Judgment (Docket Entries 19/20) is hereby **DENIED.**

(3) Defendant's Motion for Judgment on the Administrative Record (Docket Entry 18) is hereby **GRANTED.**

(4) The Clerk of Court is hereby directed to close this file.

1. Senior United States District Judge Joseph E. Irenas, sitting by designation pursuant to the provisions of 28 U.S.C. § 292(b).

2. The Motion for Summary Judgment also seeks leave to file a brief in excess of the standard page limitations.