

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-2004

# Bucks Cty Dept v. Comm PA Dept Welfare

Precedential or Non-Precedential: Precedential

Docket No. 02-3919

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

### Recommended Citation

"Bucks Cty Dept v. Comm PA Dept Welfare" (2004). *2004 Decisions.* Paper 369.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/369

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No: 02-3919
_____

BUCKS COUNTY DEPARTMENT OF
MENTAL
HEALTH/MENTAL RETARDATION,

Appellant

v.

COMMONWEALTH OF
PENNSYLVANIA,
DEPARTMENT OF PUBLIC
WELFARE;
BARBARA DEMORA
_____

Appeal from the United States District
Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-03254 )
District Judge: Berle M. Schiller
_____

Argued October 15, 2003

Before: SLOVITER, ROTH and
STAPLETON, Circuit Judges

(Opinion filed August 18, 2004)

Robert O. Baldi, Esquire (Argued)
123 West Bridge Street
New Hope, PA 18938

Counsel for Appellant

Doris M. Leisch, Esquire (Argued)
Commonwealth of Pennsylvania
Department of Public Welfare, Room 302
1400 Spring Garden Street
State Office Building
Philadelphia, PA 19130

Daniel M. Fellin, Esquire
Commonwealth of Pennsylvania
Office of Legal Counsel
Department of Public Welfare,
3rd Floor West
Health & Welfare Building
7th & Forster Streets
Harrisburg, PA 17120

Amicus-Comm. Of PA

Gary S. Mayerson, Esquire (Argued)
Mayerson & Associates
250 West 57th Street, Suite 624
New York, NY 10107

Counsel for Appellees

OPINION OF THE COURT

**ROTH**, Circuit Judge:

This    case    arises    under    the

1

Individuals with Disabilities in Education Act, 20 U.S.C. § 1400, *et seq* (1998) (IDEA). The defendant, Bucks County Department of Mental Health and Mental Retardation (Bucks County), appeals the District Court's grant of summary judgment in favor of Barbara de Mora, the plaintiff. The District Court affirmed the Hearing Officer's award, reimbursing de Mora for the time she spent working with her disabled daughter after Bucks County refused to provide the specific therapy de Mora requested as part of her daughter's therapy program.

Because the review process is a long one and children are eligible for services under Part C of IDEA only up to the age of three, parents face difficult issues when a state denies services, including the interim provision of services for the child and the financial responsibility for those services. The issue we are called upon to resolve is whether paying de Mora for the time she personally spent working with her daughter after Bucks County refused to provide services is "appropriate" relief under 20 U.S.C. § 1439(a)(1).

We will affirm the District Court. After taking into account "equitable considerations," School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts, 471 U.S. 359, 374 (1985), we hold that under the particular circumstances of this case, where a trained service provider was not available and the parent stepped in to learn and perform the duties of a trained service provider,

reimbursing the parent for her time spent in providing therapy is "appropriate" relief.

## I. FACTUAL BACKGROUND

Barbara de Mora's daughter, I.D.[1], was diagnosed with pervasive developmental delay, cerebral palsy, and deafness. Because I.D. has developmental delays, she was eligible for early intervention services under Part C of IDEA. Under IDEA, the Office of Mental Retardation of the Pennsylvania Department of Welfare administers the Pennsylvania Early Intervention Program for infants and toddlers from birth up to age three. Bucks County is the local mental health and mental retardation office responsible for coordinating services for I.D.

De Mora and Bucks County worked together to develop an individualized family service plan (IFSP) for I.D. The IFSP outlined goals and objectives for I.D. as well as services that I.D. needed to receive in order to obtain the stated goals and objectives. The IFSP was modified several times after it was first developed on July 1, 1999, and ultimately provided I.D. with 24.25 hours each week of physical therapy, speech therapy, occupational therapy, and special instruction.

De Mora grew dissatisfied with I.D.'s program because she did not feel

_____

[1] The parties agreed to refer to de Mora's daughter as I.D.

I.D. was benefitting from it. In September 1999, de Mora requested that I.D.'s IFSP be amended to provide for additional hours of therapy. She also indicated to Bucks County a preference for the Lovaas methodology of early intervention training and asked Bucks County to hire Patricia Laudon, a Lovaas-trained therapist, to provide the Lovaas training.[2] Bucks County refused to provide more hours of therapy and also refused to provide a Lovaas training program for I.D. Because de Mora was convinced that the Lovaas training would benefit I.D., she hired, without Bucks County's support, Laudon, who in turn provided in-home therapy to I.D. from October 8, 1999, through April 10, 2000.

Because Laudon was not able to spend as many hours with I.D. as I.D. needed and because de Mora was unable to find another person trained in Lovaas methodology, Laudon trained de Mora so that de Mora would be able to provide the Lovaas therapy to I.D. Laudon held one-on-one workshops where de Mora would act as the Lovaas therapist as Laudon coached her. De Mora read and learned discrete trial training teaching guidelines and other books on the Lovaas methodology. Lisa Parker, the Early Intervention Coordinator at Bucks County, testified at the due process hearing that, in her opinion, de Mora was qualified to train

---

[2] Lovaas training is a type of discrete trial training where lesson formats and behavioral reinforcements are used to teach specific skills.

I.D. De Mora spent many hours working with I.D. as a Lovaas therapist without Laudon's presence. When de Mora was deposed, she gave specific examples of training exercises she executed when training I.D. I.D.'s therapists provided affidavits confirming that de Mora was acting as a Lovaas therapist, not as a mother, when she was working with I.D.

## II. PROCEDURAL HISTORY

After Bucks County refused to amend the IFSP to provide I.D. with more hours of therapy and Lovaas training, de Mora requested a due process hearing. The Hearing Officer noted that de Mora believed that I.D. had showed immediate improvement with the initiation of the Lovaas training, but concluded that the existing IFSP was "appropriate" under 34 C.F.R § 303.344, and therefore I.D. was not entitled to any more hours of therapy or additional hours for Lovaas training:

> The County presented evidence that I.D. made progress from services provided in her IFSP before and along with Lovaas. It is understandable that the parents would ask for what they may consider as the best program and/or methodology. It may be argued that I.D.'s progress under the County services was not good enough when compared to or in conjunction with another. The County, however, does

3

not have the mandate to provide the best.

December 31, 1999 Decision of Hearing Officer at A41.

De Mora appealed the Hearing Officer's decision to the Commonwealth Court of Pennsylvania. The court noted that when determining the appropriateness of the IFSP, the Hearing Officer should have examined evidence of I.D.'s progress before the Lovaas training began, as opposed to her progress while both the Lovaas and IFSP services were provided. The court found that Bucks County did not prove that the services they provided to I.D. before the private Lovaas training began produced meaningful progress toward the IFSP goals, and therefore the IFSP was not "appropriate" for I.D. De Mora v. Dep't of Pub. Welfare, 768 A.2d 904, 908 (Pa. Commw. Ct. 2001). Because I.D. was making progress toward her goals as a result of the combination of the private Lovaas training and the services Bucks County was providing, the court held that the private Lovaas training was appropriate. Id. On the issue of providing an "appropriate" remedy for de Mora under 20 U.S.C. § 1439(a)(1), the court held that even though I.D. was no longer eligible for services under Part C of IDEA because she was over three years old, de Mora was "entitle[d] to reimbursement for her expenses in providing I.D. with private Lovaas training." Id. The court remanded the case back to the Hearing Officer to make findings as to the "actual costs" incurred by de Mora in providing the private training. Id. Bucks County did not appeal the Commonwealth Court's decision.

On remand from the Commonwealth Court of Pennsylvania, the Hearing Officer ordered Bucks County to reimburse de Mora $3,520 for expenses she incurred in paying Laudon and $6,842 for the time she personally spent providing the Lovaas training.[3] On the issue of reimbursing de Mora for the time she spent training I.D., the Hearing Officer commented:

> In the present instance, time spent by Mrs. de Mora with I.D. is not in the same vein as a mother spending time with her child in the normal course of daily living activities. Mrs. de Mora

---

[3] The $3,520 award represents 88 hours Laudon spent training I.D. from October 8, 1999, to December 14, 1999. The $6,842 award represents 311 hours de Mora spent training I.D. during the same time period. Laudon and de Mora continued training I.D. through April 10, 2000, the date on which I.D. lost eligibility for early intervention services. However, the Commonwealth Court of Pennsylvania limited the Hearing Officer's consideration of reimbursement to the number of hours Laudon and de Mora spent from October 8, 1999, to December 14, 1999, because the pleading only addressed this period of time. De Mora v. Dep't of Pub. Welfare, 768 A.2d 904, 908 n.16.

4

functioned as the provider of discrete trial training for I.D. under the rubric of Lovaas-based ABA. The discrete trial training is not an issue since it has been determined to be appropriate for I.D. What may be somewhat out of the ordinary is that Mrs. de Mora provided the training herself instead of paying a provider from outside the home.

. . .

Equitable consideration would indicate that there should be a recompense for the expenditure of time by Mrs. de Mora in providing I.D. with what the County should have provided. Were the County to have provided I.D. with the discrete trial training in the place of Mrs. de Mora, it would have incurred the cost of implementing discrete trial training for I.D.

June 3, 2001 Decision of Hearing Officer at A52-53.

The only issue Bucks County appealed to the United States District Court for the Eastern District of Pennsylvania was whether it was proper to reimburse de Mora for the time she spent with I.D. Bucks County did not appeal the Hearing Officer's order to reimburse de Mora for the costs she incurred from hiring Laudon. On cross-motions for summary judgment, the District Court granted summary judgment in favor of de Mora. <u>Bucks County Dep't of Mental Health/Mental Retardation v. de Mora</u>, 227 F.Supp. 2d 426 (E.D.Pa. 2002). The District Court concluded that IDEA does not preclude de Mora from obtaining reimbursement for time expended providing early intervention services to I.D., nor is de Mora precluded from being reimbursed because of her lack of formal certification to provide the training. <u>Id.</u> at 427.

Bucks County appealed to this Court on October 21, 2002.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 20 U.S.C. § 1439(a)(1) of the appeal from the Hearing Officer's decision. We have jurisdiction of the appeal from the District Court's decision pursuant to 28 U.S.C. § 1291.

On review of a district court's decision on a motion for summary judgment, we exercise plenary review, and we are required to apply the same test the district court should have used initially. <u>S.H. v. State-Operated Sch. Dist. of Newark</u>, 336 F.3d 260, 269 (3d Cir. 2003).

Under IDEA, the District Court, acting as a reviewing court:

5

shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1439(a)(1). Accordingly, the traditional standard for reviewing summary judgments is not applicable. As to findings of fact, the proper standard of review for the District Court, and this Court, is "modified *de novo*." S.H., 336 F.3d at 270. Under this approach, reviewing courts are "required to defer to the . . . [hearing officer's] factual findings unless . . . [they] can point to contrary nontestimonial extrinsic evidence on the record," id., or "unless the record read in its entirety would compel a contrary conclusion." Id. (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995). If the reviewing court receives additional evidence, it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record." Id. (quoting Oberti v. Bd. of Educ. of the Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993)). If the reviewing court does not receive additional evidence, "it must find support for any factual conclusions contrary" to the hearing officer's and "must explain why it does not accept the .

. . findings of fact to avoid the impression that it is substituting its own notions of sound . . . policy for those of the agency it reviews." Id. As for the legal standards applied by the District Court, our review is plenary. Id.

## IV. DISCUSSION

### A. Statutory and Regulatory Framework

Under Part C of IDEA, the federal government provides financial assistance to the states when the states "develop and implement a comprehensive, coordinated, multidisciplinary, interagency system that provides early intervention services for infants and toddlers with disabilities and their families." 20 U.S.C. § 1431(b)(1). Under Part C, infants and toddlers with disabilities, up to age three, are entitled to early intervention services provided at no cost and designed to meet the developmental needs of the children. See id. § 1432(4)(B), (C). The services are provided by "qualified personnel," id. § 1432(4)(F), and include, *inter alia*, family training and counseling, special instruction, occupational therapy, physical therapy, psychological services, and social work services. See id. § 1432(4)(E). All services, "to the maximum extent appropriate, are provided in natural environments," including the child's home and other settings where children without disabilities interact. See id. § 1432(4)(G). All services must be provided in accordance with an IFSP. See id. § 1432(4)(H). Under Part C, the IFSP is developed with the cooperation and

6

consent of the family, with an eye toward the "resources, priorities, and concerns of the family." See id. § 1436(a)(2). The IFSP contains a statement of the child's present levels of development, goals to be achieved for the child and the child's family, and the services necessary to meet the stated goals. See id. § 1436(d). Regulations mandate review of the IFSP at least every six months to determine how much progress has been made toward meeting the stated goals and whether any changes to the plan are necessary. See id. § 1436(b); 34 C.F.R. § 303.342.

Congress envisioned that the cooperative process of developing, reviewing, and modifying IFSPs would lead to disagreements between parents and the local agency in charge of administering the program. It is easy to foresee that conflicts will arise when parents and local agencies have different perspectives on what services are best for the child. To protect the family's right to early intervention services, Congress incorporated "procedural safeguards" into IDEA. 20 U.S.C. §§ 1415, 1439. These safeguards give the parents "[t]he opportunity . . . to examine records relating to assessment, screening, eligibility determinations, and the development and implementation of the . . . [IFSP]" and mandate "[w]ritten prior notice to the parents . . . whenever the State agency or service provider proposes to initiate or change or refuses to initiate or change . . . the provision of appropriate early intervention services." See id. § 1439(a)(4), (6). IDEA also entitles the

parents to an impartial due process hearing. See id. § 1415(f).

In addition to these procedural safeguards, Congress incorporated into IDEA a broad provision for judicial review:

> Any party aggrieved by the findings and decision regarding an administrative complaint shall have the right to bring a civil action with respect to the complaint in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

See id. § 1439(a)(1). On judicial review of a hearing officer's decision, the court "shall grant such relief as the court determines is appropriate." Id.

**B. Reimbursing parents for the cost of private replacement therapy is an "appropriate" remedy for IDEA violations.**

The Supreme Court in School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts, interpreted IDEA's provision mandating reviewing courts to grant "appropriate" relief as conferring broad discretion on those courts, and stated that "the only possible interpretation is that

7

the relief is to be 'appropriate' in light of the purpose of the Act." 471 U.S. 359, 370 (1985).[4] The Court in Burlington held that reimbursing parents for expenses incurred from placing their child in private school is "appropriate" relief when a court has found that the public school placement was inappropriate and that the parents' private placement was appropriate. Id.

We also have broadly interpreted the term "appropriate." In W.B. v. Matula, we "discern[ed] nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no 'clear direction' to rebut the presumption that all relief is available." 67 F.3d 484, 494 (3d Cir. 1995). We also

caution[ed] that in fashioning a remedy for an IDEA violation, a district court may wish to order educational services, such as compensatory education beyond a child's age of eligibility, or reimbursement for providing at private expense what should have been offered by the school, rather than compensatory damages for generalized pain and suffering.

Id. at 495.

Here, the Commonwealth Court of Pennsylvania determined that the IFSP was not "appropriate" because I.D. was not making meaningful progress toward her IFSP goals. The court also determined that the private training was appropriate. De Mora v. Dep't of Pub. Welfare, 768 A.2d at 908. Bucks County never appealed these findings.

Because the Commonwealth Court determined that the privately delivered services were appropriate and because Bucks County's denial of these services made the IFSP inappropriate and constituted a violation of IDEA, under Burlington and under our own precedent, de Mora is entitled to reimbursement for the privately delivered services. Bucks County does not appeal the Hearing Officer's reimbursement award for the costs de Mora incurred from hiring Laudon, however. It challenges the reimbursement award for the time de Mora

---

[4] In Burlington, the Court interpreted the remedial provision under Part B of the Education of the Handicapped Act, IDEA's predecessor, which grants eligible children the right to "free appropriate education." 20 U.S.C. § 1415(a). While Part C of IDEA provides services to infants and toddlers, up to age three, in accordance with an IFSP, Part B provides special education services to children from age three to twenty in accordance with an individualized education plan (IEP). The remedial provisions under Part B and Part C are, however, identical. Compare 20 U.S.C. § 1415(i)(2)(B) with 20 U.S.C. § 1439(a)(1) (both stating that the court "shall grant such relief as the court determines is appropriate.").

personally spent with I.D. That question is an issue of first impression for this Court.

### C. Under Burlington, paying de Mora for her time would constitute reimbursement, not damages.

The Pennsylvania Department of Public Welfare filed a brief as Amicus Curiae. The Department argues that paying de Mora for her time would not be "appropriate" relief because she never incurred any out-of-pocket expenses by providing services to I.D. herself. The Department contends further that paying de Mora for the time she personally spent would constitute a damages award, and damages are not recoverable under IDEA.[5]

---

[5] The Department cites Matula for the proposition that damages are not recoverable in an action brought under IDEA. In Matula, we allowed the awarding of monetary damages in an action brought under 42 U.S.C. § 1983 in which the plaintiff asserted a violation of IDEA. 67 F.3d at 495. The Department argues that damages are not allowed here because this is not a § 1983 action.

We have not settled whether damages are recoverable in an action arising solely under IDEA. See Matula, 67 F.3d at 494-95 (in a § 1983 action to enforce IDEA, we noted that "even if we were to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way."); see also Polera v. Bd. of Educ. of the Newburgh Enlarged

Because paying de Mora for her time constitutes reimbursement and not damages, we do not need to decide today whether monetary damages may be recovered in an action brought under IDEA. In Burlington, the Supreme Court addressed the same reimbursement/damages argument, rejected it, and defined reimbursement:

> Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.

471 U.S. at 370-371. A damages award on the other hand is recompense for "generalized pain and suffering." Matula, 67 F.3d at 495; see also Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478 (2d Cir. 2002) (noting that a damages award "is redress for a broad range of harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages.").

De Mora is not seeking recompense for her or I.D.'s pain and suffering, mental anguish or other "damages" as a

---

City Sch. Dist., 288 F.3d 478, 485 (2d Cir. 2002) (noting that in Matula we "addressed the issue without endorsing the view that damages are never available under the IDEA.").

consequence of Bucks County's violation of IDEA. Reimbursement involves a "*post hoc* determination of financial responsibility," Burlington, 471 U.S. at 371, and if Bucks County had provided the Lovaas training to I.D. as de Mora requested, it would have borne the full expense of the therapy. In fact, as a result of the "*post hoc* determination of financial responsibility" in this case, Bucks County will actually be paying less than the cost it would have borne had it met its burden of providing the services in the first instance.[6]

It is true that the typical reimbursement cases involve reimbursing actual out-of-pocket expenses. See e.g., Burlington, 471 U.S. 359 (cost of private education); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993) (cost of private education); Adams v. Oregon, 195 F.3d 1141 (9th Cir. 1999) (cost of private therapy). However, "appropriate" should not be read so narrowly so as to preclude de Mora from being paid for her time just because she did not write a check to a third

---

[6] If Laudon had provided all 399 hours of Lovaas training from October 8, 1999 to December 14, 1999, Bucks County would have had to pay a rate of $40/hour for a total cost of $15,960. Instead, Laudon provided 88 hours of training and de Mora provided 311 hours. The Hearing Officer ordered reimbursement for Laudon's time at a rate of $40/hour and de Mora's time at a rate of $22/hour for a total cost of $10,362. Accordingly, Buck County is saving $5,598.

party. If we limited reimbursement to actual out-of-pocket expenses, we would give a narrow construction to "appropriate," and this would be contrary to both the Supreme Court's broad interpretation of the term in Burlington and our own broad interpretation in Matula.

Reimbursing parents for the time and services necessary for their child, when there has been an IDEA violation, is not unheard of. The First Circuit in Hurry v. Jones, 734 F.2d 879 (1984) held that in fashioning "appropriate" relief, reimbursement should not be limited to out-of-pocket expenses. In Hurry, the school's failure to provide door-to-door transportation violated the Education of the Handicapped Act (IDEA's predecessor). The main issue was whether the parents were entitled to reimbursement for driving their child to and from school. Id. at 883-84. The court noted that it held an "expansive view of reimbursement" and concluded that the father was entitled not only to reimbursement for the weekly transportation costs he incurred, but also to "compensation for the expenditure of time and effort" for delivering the services that the state should have provided. Id. at 884; see also Barnesville Exempted Village Sch. Dist., 26 IDELR 1168, (LRP) No. 97-1 (June 30, 1997) (mother entitled to reimbursement for time she spent home-schooling her son); cf. Straube v. Florida Union Free Sch. Dist., 801 F.Supp. 1164, 1182 (S.D.N.Y. 1992) (distinguishing Hurry and holding that a father was not entitled to compensation for time spent

raising money to send his son to private school because his time was not spent on delivering the services but on raising money). The only danger that the Hurry court recognized in allowing this type of reimbursement was the potential for excessive reimbursement. Hurry, 734 F.2d at 884.

**D. Under Florence County, the Hearing Officer awarded a "reasonable level of reimbursement" to de Mora for her time.**

The Supreme Court in Florence County cautioned that reimbursement would not be "appropriate" if the cost of the private replacement is unreasonable. 510 U.S. 7, 16 (1993). The Court noted that "[c]ourts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." Id.; accord Adams v. Oregon, 195 F.3d 1141, 1151 (9th Cir. 1999) (Parents "are entitled to reimbursement if their private placement and tutoring . . . was appropriate and reasonable.").

The Department argues that the amount the Hearing Officer awarded is not a "reasonable level of reimbursement," yet it does not offer any explanation why the amount is unreasonable. In fact, the amount that the Hearing Officer awarded de Mora for her time is a "reasonable level of reimbursement." First, de Mora is reimbursed for her time at $22/hour, approximately half the rate that Laudon

charged. Second, the Hearing Officer noted that "the hourly rate so submitted [for de Mora] is within the range of the cost of a teacher had the County employed such for I.D." June 3, 2001 Decision of Hearing Officer at A54. We take note of the Hearing Officer's finding that $22 an hour is within the range of the cost that Bucks County would have had to pay and conclude that the level of reimbursement awarded is reasonable. We also conclude that the total number of hours of Lovaas training was not excessive. The Lovaas program recommends a total of 40 hours per week of training, and the combined number of hours of training provided by de Mora and Laudon amounted to 40 hours per week. Therefore, reimbursing de Mora for 40 hours of private therapy is reasonable. See T.H. v. Bd. of Educ. of Palatine Cmty. Consol. Sch. Dist., 55 F.Supp. 2d 830, 844-45 (N.D.Ill. 1999) (reimbursement cost not excessive because 38-hour Lovaas program does not exceed the range of appropriate treatment levels recommended by experts).

Reimbursement for De Mora's time at the rate of $22 an hour is "well within any reasonable estimate of fair reimbursement." Hurry, 734 F.2d at 884. Moreover, as we indicated above, if Laudon had provided all of the hours of training, Bucks County would have to make reimbursement at a higher level.

**E. De Mora is entitled to reimbursement even though she does not fit IDEA's definition of "qualified personnel."**

11

Bucks County argues that reimbursing de Mora would not be "appropriate" because she is not "qualified personnel." Bucks County is correct in asserting that de Mora is not "qualified personnel" as defined by IDEA and its regulations.[7] She does not have a formal education in behavioral science and does not hold a license or certification to

---

[7] The IDEA defines "qualified personnel" as
> (i) special educators;
> (ii) speech-language pathologists and audiologists;
> (iii) occupational therapists;
> (iv) physical therapists;
> (v) psychologists;
> (vi) social workers;
> (vii) nurses;
> (viii) nutritionists;
> (ix) family therapists;
> (x) orientation and mobility specialists; and
> (xi) pediatricians and other physicians.

20 U.S.C. § 1432(4)(F); see also 34 C.F.R. § 303.12(e) (containing a similar list of professions). "Qualified" is defined in the regulations as "a person [who] has met State approved or recognized certification, licensing, registration, or other comparable requirements that apply to the area in which the person is providing early intervention services." 34 C.F.R. § 303.22.

practice in the field.

There is support, however, from the Supreme Court for the proposition that although the state is required to use "qualified personnel" when the state is providing the services, parents are not required to find a replacement who meets the definition of "qualified personnel" when the state fails to provide appropriate services and there is an IDEA violation. Florence County, 510 U.S. at 14. In Florence County, the Supreme Court held that parents were entitled to reimbursement for private education expenses even though the private school did not meet state standards. The Court reasoned that if parents were required to place their children in schools that do meet the state's requirements, it would eliminate their right to withdraw their child from the inappropriate placement and the child's right to an appropriate education. Id. at 14.

Similarly, the requirement that "qualified personnel" deliver the services under Part B of IDEA does not make sense in the context of choosing substitutions for therapy. De Mora's rejection of the existing IFSP, and Bucks County's failure to modify the plan to conform to her wishes, are the reasons she decided to look for a private therapist. It would be inconsistent with IDEA's goals to forbid parents from using a replacement to provide appropriate early intervention services "'simply because that . . . [person] lacks the stamp of approval of the same . . . system that failed to meet the child's needs in the first place.'" Id. at 14 (citing

12

Carter v. Florence County Sch. Dist. Four, 950 F.2d 156, 164 (4th Cir. 1991)).[8]

---

[8] Bucks County also argues that Laudon was not qualified to train de Mora and that Laudon and de Mora did not implement a professional discrete trial program. Bucks County asserts that Laudon did not develop a written curriculum to document the program and that neither Laudon nor de Mora kept daily logs or records covering I.D.'s success.

First, by challenging de Mora's qualifications as well as Laudon's and de Mora's alleged failure to develop a written curriculum and document I.D.'s success, Bucks County is really challenging the appropriateness of the private training that Laudon and de Mora provided. However, the inappropriateness of the IFSP and the appropriateness of the private therapy has already been adjudicated by the Commonwealth Court, and Bucks County did not appeal those findings.

Second, as the District Court remarked, Bucks County's argument that de Mora did not document I.D.'s success and therefore did not implement a proper discrete trial training program does not square with its position with respect to Laudon. Bucks County Dep't of Mental Health/Mental Retardation, 227 F.Supp. 2d at 430. According to Bucks County, Laudon did not document I.D.'s success during the time that she and de Mora were using the new program. Bucks County challenges the reimbursement

**F. De Mora should be reimbursed because she acted as a service provider and provided therapy to I.D.**

We now reach the crucial question in this appeal. Can de Mora, as a parent, be reimbursed for providing the Lovaas training to I.D. Bucks County and the Department argue that reimbursing de Mora would be compensating her for doing exactly what Congress intended parents to do, *i.e.*, actively participate in the provision of the early intervention services. They argue that while Congress intended parents to be actively involved, Congress did not contemplate compensating parents for their participation. Congress did indeed contemplate parental involvement and participation in the provision of early intervention services. The Early Intervention Program is directed at meeting the needs of eligible children and the needs of families "related to enhancing the child's development." 34 C.F.R. § 303.12; accord 34 C.F.R. § 303.11 Under IDEA, early intervention services include family training and counseling. The state

---

award to de Mora for her time on that ground, yet it did not challenge the award with respect to Laudon. In addition, Bucks County blames de Mora for not integrating the Lovaas-based therapy into the IFSP. It was de Mora, however, who wanted in the first place to integrate as program into the IFSP. Bucks County turned her away.

13

must provide "a family-directed assessment of the resources, priorities, and concerns of the family and the identification of the support and services necessary to enhance the family's capacity to meet the developmental needs of the infant or toddler." 20 U.S.C. §§ 1436(a)(2), 1432(4)(E); 34 C.F.R. § 303.12(c)(2). The parents are expected to participate in the development of the IFSP, and "[t]he contents of the . . . [IFSP] shall be fully explained to the parents and informed written consent from the parent shall be obtained prior to the provision of early intervention services." 20 U.S.C. § 1436(a)(3), (e); 34 C.F.R. § 303.12(a)(2).

Although Congress envisioned parental involvement, however, Congress primarily contemplated that Bucks County would provide the early intervention services to I.D. and her family at no cost and that de Mora and her family would not have to resort to providing those services or paying for them. The level of parental involvement that Congress intended when a state meets its burden of providing appropriate early intervention services is entirely separate from what Congress intended as a remedy when a state fails to meet that burden. Congress contemplated a broad remedy when it gave reviewing courts the discretion to award "appropriate" relief. "Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA." Matula, 67 F.3d. at 494-95.

There is another compelling reason for our conclusion that Congress intended the remedy sought by de Mora in the specific context of this case. *Burlington* held that, in order to satisfy Congress' intent that the services provided under IDEA be free, parents are entitled to seek retroactive reimbursement for providing appropriate replacement services where the state has failed to meet is obligations. We have recognized, however, that not all parents are capable of obtaining appropriate replacement services. *See Lester H. v. Gilhool*, 916 F.2d 865, 872-73 (3d Cir. 1990). In *Lester H.*, a case arising under Part B, we held that "Congress, by allowing the courts to fashion an appropriate remedy to cure the deprivation of a child's right to a free appropriate public education, did not intend to offer a remedy only to those parents able to afford an alternative private education." *Id.* at 873. We therefore concluded that an "appropriate" remedy encompasses the power of a court to order school authorities to provide compensatory education to a child, even beyond the child's age of eligibility for such services under Part B.

In this case, de Mora was certainly able to afford appropriate replacement services for I.D., but could not find anyone to provide those services. She was consequently faced with precisely the same dilemma as the parents in *Lester H.*: the state was not providing appropriate services and she was unable to obtain replacement services. Consistent with our holding in *Lester H.*, we must accept the proposition that de Mora is entitled to some type of remedy that is consistent with the purposes of Part C of IDEA. Because of significant differences between Part B

and Part C, however, the compensatory remedy that was available in *Lester H.* would be ineffective and insufficient for correcting Bucks County's violation in this case.

First, whereas a compensatory remedy may be effective under Part B because it allows disabled children to receive free services beyond their age of eligibility, such a remedy provides no benefit under Part C because disabled infants and toddlers become immediately eligible for Part B services upon reaching age three.

Second, and more significantly, Congress could not have intended that de Mora expend valuable time litigating the appropriateness of I.D.'s IFSP in order to thereafter obtain a compensatory remedy. This is because Part C evidences a recognition that the timely provision of appropriate services to disabled infants and toddlers between birth and age three is crucial for their development. In enacting Part C, Congress recognized that these beneficiaries in particular "would be at risk of having substantial developmental delay if they d[o] not receive early intervention services." 20 U.S.C. § 1431(b)(4). The House Committee on Education and Labor specifically acknowledged this problem when it stated that "[i]t is also the Committee's intent that the procedures developed by the State result in speedy resolution of complaints because an infant's development is rapid and therefore undue delay could be potentially harmful." H. R. Rep. No. 99-860, at 14 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2401, 2415. By providing early intervention services during these crucial first three years of a disabled child's life, Congress sought "to minimize their potential for developmental delay," 20 U.S.C. § 1431(a)(1), and "to reduce the educational costs to our society . . . by minimizing the need for special education and related services after infants and toddlers with disabilities reach school age." *Id.* § 1431(a)(2).

Given the high aspirations that Congress intended for Part C services, and the quite brief amount of time allotted to achieve those aspirations, we are convinced that, faced with the choices of: (1) capitulating to Bucks County's provision of inappropriate early intervention services to I.D., (2) expending the time necessary to seek a compensatory remedy, or (3) getting trained to provide appropriate services to I.D. herself, providing such services, and thereafter commencing litigation to seek reimbursement for her efforts, Congress intended de Mora both to have, and to exercise, the third option. This third option seems especially appropriate in the case at hand, where de Mora was able to acquire the necessary Lovaas training and transition into the role of service-provider seamlessly without any resultant interruption or delay in I.D.'s program. We do not presume that a parent will be able, or willing, to exercise this option in every case, but where he or she does, reimbursement for the reasonable value of those efforts is consistent with Congressional intent to provide an

15

"appropriate" remedy.

Bucks County's argument about parental involvement would be more convincing if in fact de Mora had merely been acting as an involved parent. There is, however, ample evidence in the record to support the conclusion that de Mora stepped into the shoes of a therapist, ultimately acting over and above what is expected of parents under IDEA. The Hearing Officer made a finding that de Mora was herself a trial training provider:

> In the present instance, time spent by Mrs. de Mora with I.D. is not in the same vein as a mother spending time with her child in the normal course of daily living activities. Mrs. de Mora functioned as the provider of discrete trial training for I.D.

June 3, 2001 Decision of Hearing Officer at A52-53. The District Court agreed and found that "Mrs. de Mora, in providing the Lovaas training, acted well beyond the parental role contemplated under Part C." Bucks County Dep't of Mental Health/Mental Retardation v. De Mora, 227 F.Supp. 2d at 429. The District Court was required to defer to this finding unless it could point to contrary nontestimonial extrinsic evidence. S.H., 336 F.3d at 270. There is no contrary nontestimonial extrinsic evidence that the District Court could have relied on to make a different finding. A reading of the entire record does not compel a different finding. Furthermore, the additional evidence the District Court received, in the form of depositions and affidavits, supports the Hearing Officer's findings.

Laudon trained de Mora by engaging in one-on-one workshops where de Mora would act as the implementer of the Lovaas curriculum and Laudon would coach her. The implementer is the therapist who works one-on-one with the child in a controlled environment to help the child master certain tasks. The parent is usually referred to as a generalizer because the parent generalizes the skills learned in therapy into the home environment. For example, in therapy, the implementer and the child may be working on matching objects to pictures. During implementation, the child would repeat the task until the child performed it correctly. During generalization, the parent may ask the child to match an object to a picture while they are in the kitchen getting ready for dinner. During the generalization process, the parent does not teach the child how to master new tasks but reinforces the training initiated by the implementer.

This workshop method is the same method by which Laudon was trained and which Laudon used to train other implementers. De Mora read and learned discrete trial training teaching guidelines and other books on the Lovaas methodology. It is evident from her deposition that she is very familiar with the guidelines. She also spent many hours watching Laudon act as an implementer and talking to Laudon on the phone. Lisa

16

Parker, the Early Intervention Coordinator at Bucks County, testified at the due process hearing that, in her opinion, de Mora was qualified to train I.D.

The evidence here supports the conclusion that de Mora acted not only as a generalizer but also as an implementer. De Mora is familiar with the discrete trial training techniques. When questioned, de Mora was able to give concrete examples of how she worked with I.D. as an implementer to master certain tasks. She testified that she was very learned in the teaching guidelines, and noted the importance of strict adherence to the guidelines in order to achieve positive results. Finally, the affidavits from four other therapists who were present in the home with de Mora and observed de Mora perform the Lovaas training confirm that De Mora was acting as a therapist, not as a mother, when she was working with I.D.[9]

[9] The Department of Public Welfare correctly points out that Part C of IDEA, which governs early intervention services for infants and toddlers, includes parents and children in service delivery, whereas Part B, which governs special education services for school-age children, includes only children in service delivery. This difference, they assert, strengthens their argument that the time de Mora spent with I.D. was time for which Congress intended her to spend and not be compensated.

This argument overlooks the crucial finding that, as we discussed, de Mora not only acted as a parent, as Congress intended, but also acted as a service provider. Furthermore, this argument overlooks the fact that parental involvement is contemplated throughout all of IDEA. While eligible children and their families are the recipients of services under Part C, 20 U.S.C. § 1433 ("provide early intervention services for infants and toddlers with disabilities and their families"), and children alone are the recipients of services under Part B, 20 U.S.C. § 1411 ("provide special education and related services to children with disabilities"), this does not mean that Congress envisioned parental involvement to differ as soon as a child turns three years old, becomes eligible for special education services, and loses eligibility for early intervention services. As the Supreme Court noted in Burlington, "[i]n several places, [Part B of] the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness." 471 U.S. at 368; see also 20 U.S.C. §§ 1400(c), 1401(19), 1412(7), 1415(b)(1)(A), (C), (D), (E), 1415 (b)(2); 34 C.F.R. § 300.345 (1984).

The Department of Public Welfare also argues that de Mora should not be compensated because the Lovaas program places emphasis on parental involvement, and "Mrs. de Mora's involvement in her child's programming was entirely consistent with the parental role expected by and, indeed, critical to the success of . . . the Lovaas program in

**G."Equitable considerations" favor reimbursing de Mora.**

The Department urges us to reverse the District Court's decision because "[a]lthough intending to constrain the effect of its decision, the district court instead identified considerations that will apply to virtually every successful administrative challenge to an IFSP under Part C." To the extent the Department is expressing a concern over the potential financial burden on Bucks County, it is not a viable one. Bucks County had the opportunity, upon de Mora's request, to provide appropriate early intervention services. If Bucks County had complied with IDEA's mandate, they "need not worry about reimbursement claims." Florence County, 510 U.S. at 15.

_____

particular." It is true that the Lovaas program, like IDEA, envisions parental involvement. In particular, under the Lovaas program, parents are supposed to reinforce the skills that the children have already learned from working with the therapist. Parental involvement in this capacity is designed with the aim of generalizing skills the child learns into unstructured daily activities. O. IVAR LOVAAS ET AL., TEACHING INDIVIDUALS WITH DEVELOPMENTAL DELAYS, 311 (Pro Ed 2002) (see Chapter 32 titled "Involving Parents in Treatment"). Like IDEA, however, the Lovaas program does not envision parents acting as service providers, as de Mora did here.

Moreover, affirming the District Court will not have as far reaching effects as the Department of Public Welfare imagines. Reimbursement under the particular facts of this case will be limited to situations where 1) there has been a violation of IDEA and appropriate private services were provided, see Burlington, 471 U.S. at 370, 2) the amount of the reimbursement is reasonable, see Florence County, 510 U.S. at 16, and 3) a trained service provider was not available so that the parent stepped in to act as the trained service provider and not as a parent.

Finally, "equitable considerations are relevant in fashioning relief." Burlington, 471 U.S. at 374. Bucks County carries the burden of providing appropriate early intervention services, but Bucks County failed to meet this burden. De Mora was left with a choice. She could have accepted the original IFSP, which at the time she thought would be to I.D.'s detriment, or she could have found appropriate replacement services. She opted to find someone to provide the Lovaas training. However, she ran into yet another obstacle -- the one person she did find could not work the hours that I.D. needed under the program to obtain better results. De Mora could not find another provider to work the remaining hours so she chose to train in discrete trial methodology and provide the therapy to I.D. herself. She spent many hours in training with Laudon and acted as an implementer of discrete trial therapy. "It would be an empty victory to have a court tell . . . [de Mora] several years later that

18

. . . [she] was right" but that she is not entitled to reimbursement for the time she spent providing therapy. Id. at 370. If that were the case, the family's right to appropriate early intervention services at no cost would be denied.

## V. CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in de Mora's favor.

B U C K S   C O U N T Y   v. COMMONWEALTH OF PA

No. 02-3919

---

SLOVITER, Circuit Judge, concurring.

I agree with much of the majority's opinion in this case, and see no reason to repeat either the facts or the arguments of the parties. In particular, I agree with the majority's approval of the order requiring Bucks County to reimburse Mrs. de Mora for the expenses that she incurred in paying Laudon for the services she performed. Although Bucks County suggests that Laudon was not a qualified professional because she had no training or experience in developing and imparting the requisite knowledge of the Lovaas program to others, Bucks County does not challenge the administrative officer's order authorizing repayment for Laudon's own services. It does appeal, however, the order of the District Court requiring it to reimburse Mrs. de Mora for her services delivered directly to her child.

The majority cites no statutory provision or regulation authorizing such payment. The majority agrees with Bucks County that Mrs. de Mora does not fall within the category of "qualified personnel" as defined in the statute. Instead, it bases its decision approving reimbursement to the mother of the disabled child on "equitable considerations."

I am concerned that the majority has set a precedent that opens a wide gap between that which is properly reimbursable and that which is not. Parental involvement with a disabled child should be expected as a matter of course. Nonetheless, because the majority takes pains to limit the scope of its decision, and in particular because of its conclusion that "a trained service provider was not available," I join its judgment, albeit with reservations.[10]

---

[10] I am personally familiar with Bucks County. It is not in the wilderness. It borders the City of Philadelphia, and is home to numerous fine hospitals, medical centers and professionals. However, I have no basis to dispute the majority's conclusion that Mrs. de Mora could not find a qualified professional. I have no personal familiarity with the Lovaas program and therefore do not know whether it is or is not commonly available.

19