

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2007

# M. v. Delaware Cty Ofc

Precedential or Non-Precedential: Precedential

Docket No. 06-1960

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"M. v. Delaware Cty Ofc" (2007). *2007 Decisions.* Paper 840.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/840

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-1960

———

ANDREW M.; DEIRDRE M.,
ON THEIR OWN BEHALF AND ON
BEHALF OF THEIR MINOR SONS; P. M.; R. M.,

v.

DELAWARE COUNTY OFFICE OF MENTAL
HEALTH AND MENTAL RETARDATION;
DOROTHY KLEIN, IN HER OFFICIAL CAPACITY,

Appellants

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-cv-04336)
Magistrate Judge:  Honorable Jacob P. Hart

———

Argued March 26, 2007
Before:  FISHER, JORDAN and ROTH, *Circuit Judges*.

(Filed: June 15, 2007 )

Barbara E. Ransom (Argued)
Public Interest Law Center
 of Philadelphia
125 South 9th Street, Suite 700
Philadelphia, PA  19107
        *Attorney for Appellees*

Susan McDonough (Argued)
Holsten & Associates
One Olive Street
Media, PA  19063
        *Attorney for Appellants*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

This case comes to us on appeal from the District Court's grant of summary judgment in favor of Andrew and Deirdre M. (jointly the "Ms"). The District Court concluded that the Delaware County Office of Mental Health and Mental Retardation ("the County") had violated Part C of the Individuals with Disabilities Education Act ("IDEA") and the Rehabilitation Act ("RA") by denying the Ms' twin sons services in their natural environment, and granted the Ms compensatory education and attorney's fees. The County appealed, claiming that the Ms did not put forth evidence proving that the services required under the IDEA were

2

discontinued for the period in question or that the services were not provided in an appropriate environment, and that the Ms failed to prove an RA violation. For the reasons set forth below, we will affirm the District Court's grant of summary judgment on the IDEA claim and reverse its grant of summary judgment on the RA claim.

I.

A.

R.M. and P.M. are brothers and fraternal twins who were born on November 10, 2000. The Ms are their parents. In 2002, both twins were presenting with significant speech and communication delays and functioning at levels significantly below their peers. Based on these problems, the County determined that they were eligible for Early Intervention ("EI") services in accordance with Part C of the IDEA, and assembled a team to develop an Individualized Family Service Plan ("IFSP") for each boy. After it was determined that the speech services the twins received were not effective in the home, the IFSP team determined that services could better be rendered in a classroom-based program as the boys needed social interaction with peers and adults. Therefore, the team and the parents filled out a "Justification for Center-Based Services" form, which authorized the boys' speech services to be provided at a center for special-needs children run by the Cerebral Palsy Association

3

of Delaware County ("CADES").[1]  Both parties agree that the center is a segregated environment as it does not provide services for children who are not disabled.

As part of their IFSPs, both R.M. and P.M. used the Picture Exchange Communication System (PECS).  The PECS provides a way for children with speech delays to communicate through the use of icons.  Both boys received year-round PECS services.  In March of 2003, Mrs. M. requested that the twins be allowed to attend a two-week PECS summer camp.  The request was denied and the Ms sent the twins to the camp at their own expense.

In the meantime, on January 20, 2003, Mrs. M. requested that the EI services which were currently provided at the CADES center be provided in a "typical setting."  She told the County that she had found a location, St. Faith's, where the boys could have a classroom setting that included involvement with non-developmentally-delayed children.  The County denied that request, stating that Delaware County could not provide that service as it did not have a contract to provide services at St. Faith's.  Therefore, on January 22, 2003, the Ms enrolled the twins at St. Faith's at their own expense.  While there is a dispute as to whether the boys continued receiving certain EI services somewhere other than St. Faith's, the County agrees

---

[1]Under Part C of the IDEA, if early intervention services are provided outside the natural environment, an IFSP must include a justification for such a change.  34 C.F.R. § 303.344(d)(ii).

4

that it did not provide EI services at St. Faith's between January and June 2003. The County's records indicate that Mrs. M. requested services at St. Faith's on at least two other occasions, April 30, 2003 and May 2, 2003. Eventually, the County sent someone to observe the boys at St. Faith's. Mindy Glassberg, the boys' primary PECS therapist, testified that she observed the boys on April 28 and May 1, 2003, at Mrs. M.'s request. The County's records indicate that it sent someone from CADES to observe the boys at St. Faith's in late May 2003. On June 5, 2003, the County informed the Ms that the CADES observer believed that two, hour-long units per month of speech services would be appropriate at St. Faith's. While Mrs. M. had been hoping for more frequent services, she agreed to begin with the two hours per month. Shortly thereafter, the boys began receiving EI services at St. Faith's.

In July, 2003, the Ms requested that a new PECS therapist replace Glassberg. The Ms claim that during the transitional period between therapists that followed, P.M. and R.M. were not provided the PECS services required by their IFSPs. The County did not dispute that there were missing PECS service hours.

B.

Based on their disputes with the County over the twins' EI services, the Ms brought two different due process claims against the County. Initially, after the County denied Mrs. M.'s request that it pay for her sons' attendance at the PECS summer camp, the Ms brought a due process claim against the County seeking compensation for the boys' attendance. After a three-

5

day hearing (on June 10, June 25, and July 10, 2003), the Hearing Officer determined that, while attendance at the camp might be beneficial for the boys, it was not necessary. The boys were making appropriate progress under their IFSPs as written without attendance at the camp. Because there was general agreement between the Ms and the County that the IFSPs were appropriate, and because there was no strong evidence suggesting the boys were required to attend the camp, the Hearing Officer denied the Ms' claim for compensation for the PECS summer camp.

The Ms appealed the decision to the District Court for the Eastern District of Pennsylvania.[2] In addition to seeking compensation for the twins' attendance at summer camp, the Ms also made a claim for the missing PECS service hours, which had not been briefed before the Hearing Officer. The District Court ruled that the County erred in failing to fund the camp for P.M., but not for R.M. As to the missing service hours, the District Court found that the Ms had not exhausted their administrative remedies and, therefore, dismissed the claims without prejudice so that the Ms could return for a decision at the administrative level.

In January 2005, the Ms returned to the administrative level seeking compensatory education for the PECS hours that

---

[2]By the consent of the parties, the case was transferred to a magistrate judge, who was designated as the trial judge. References in this opinion to the District Court indicate the magistrate judge, sitting by designation.

6

were missed during the therapists' transition and seeking relief because the twins were not provided EI services in their "natural environment" for the first five months they were at St. Faith's. The Ms also made a claim under the RA. All evidence and additional briefing was to be submitted to the Hearing Officer by May 24, 2005. The Ms submitted a brief on May 24 and additional exhibits on May 28. The County did not submit any information. Based on the evidence before her, the Hearing Officer ruled as to each twin individually.

The Hearing Officer made the following findings of fact. She determined that both children suffered from developmental delays that resulted in their approval for EI services under the IDEA. Both children had speech services transferred to the CADES center so as to receive services in a center-based program. This was necessary because the CADES program maximized interaction with peers and adults and provided a structured environment in which to engage in activities with other children and adults. After the twins began attending St. Faith's, the Ms expressed concerns that the boys were not interacting at an appropriate level and requested that someone from the County come observe the boys at St. Faith's. "It took at least two months for someone to observe [the twins] at St. Faith's." As to the missing PECS hours, the Hearing Officer determined that the County failed to provide approximately nineteen hours of PECS services to R.M. and five hours of PECS services to P.M.

Based on these factual findings, the Hearing Officer made the same legal determinations as to each boy (except for finding that each was entitled to a different number of missing

PECS hours). The Hearing Officer first determined that there was no dispute that the boys were deprived of PECS services while they were clients of the County. Finding that the most common remedy under Part B of the IDEA for deprivation of services is compensatory education, the Hearing Officer found that this was also an appropriate remedy under Part C and ordered the County to provide R.M. with seventy-seven fifteen-minute units of compensatory education services and to provide P.M. with nineteen fifteen-minute units of compensatory education services.

The Hearing Officer next addressed the Ms' natural environment claims. The Hearing Officer determined that "natural environment" under Part C of the IDEA included St. Faith's, as it was an environment where typical, non-developmentally-delayed children would be found. Concluding that the "natural environment" requirement under Part C of the IDEA was analogous to the "least restrictive environment" requirement under Part B of the IDEA, the Hearing Officer found that it was the County's burden to show that the twins were educated in their natural environment. She found that the County had failed to show that it had provided the boys with services in their natural environment. The Hearing Officer ultimately awarded the Ms $755.50 in tuition reimbursement for each child for the time spent at St. Faith's without the services, but did not award compensatory education for the five months that services were not provided in the natural environment.[3] The

_____

[3]The Hearing Officer also determined that this kind of compensatory award was appropriate under the County's Mental

8

Hearing Officer did not address the Ms' RA claim. The County did not appeal the Hearing Officer's decision.

Following the decision, the County paid the tuition reimbursement ordered by the Hearing Officer, but the ordered compensatory education for the missing PECS hours was not provided, as the parties could not agree as to how to make up those hours. After the County refused to pay attorney's fees that the Ms had requested by letter, the Ms filed a complaint in the District Court for the Eastern District of Pennsylvania on August 12, 2005.

The Ms' complaint sought attorney's fees under the RA, the Americans with Disabilities Act ("ADA") and § 1983, the relief they were due under the Hearing Officer's opinion, and additional relief not granted by the Hearing Officer. The Ms' complaint alleged that the Hearing Officer had found in favor of their children on the natural environment claim, but did not provide compensation for the services listed on the IFSP that were not provided when the children were at St. Faith's. In addition, the Ms maintained that § 749a(b) of the RA provided an additional basis for recovery, including the award of attorney's fees to the prevailing party in an action under the RA.

Following service of the Complaint, the parties filed cross-motions for summary judgment. Based on the motions, the District Court entered judgment in favor of the Ms. As to

Health and Mental Retardation program as part of "special instruction," which is listed as a reimbursable expense.

the Ms' claim that the Hearing Officer agreed with them on their natural environment claim but failed to provide compensation, the District Court agreed, finding that the services that had been provided to the twins at the CADES center prior to their enrollment at St. Faith's had ceased as of January 2003. "The County has not argued here, nor did they argue before the H[earing] O[fficer], that the prescribed services were actually provided between January and June, 2003, such as if, for example, the children attended both CADES and St. Faith's at the same time." It, therefore, awarded the Ms compensatory education. As to the Ms' claim under the RA, the District Court simply stated that "I have found that the Plaintiffs' claim for five months of compensatory education for the missing supplemental services was valid. As the prevailing parties in a Rehabilitation Act case, Plaintiffs are entitled to recover attorney's fees."[4] The District Court found that the County could not be held liable under § 1983.

Following this initial decision, entered on January 18, 2006, the District Court allowed the parties to provide additional briefing on the issue of attorney's fees. Following the receipt of briefs on the issue, the District Court again determined that the Ms could recover attorney's fees. While Part C of the IDEA does not provide for the recovery of attorney's fees, the District Court stated that attorney's fees were recoverable under § 749a(b) of the RA. However, the District Court ruled that the

[4]The District Court also found that the Ms could recover under the ADA, 42 U.S.C. § 12117, but found that this was irrelevant to its decision.

10

only fees which were recoverable were those expended in bringing the appeal to the District Court and not those costs that resulted from bringing the claims which were successful at the administrative level. The District Court therefore awarded the Ms approximately $15,000 in attorney's fees.

This timely appeal followed.

## II.

We have jurisdiction over the final order of the District Court pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's grant of summary judgment, considering whether, based on the affidavits and documents presented, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005). When reviewing an administrative determination under the IDEA, both the District Court and we use a "modified *de novo* standard," giving due deference to the administrative determination. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). The legal standards governing a grant of attorney's fees are legal questions which we review *de novo*. *In re AT&T Corp.*, 455 F.3d 160, 163-64 (3d Cir. 2006).

## III.

Two of the claims in this case arise under Part C of the IDEA, 20 U.S.C. § 1431, *et seq*. Based on a Congressional finding that there was an urgent need to "enhance development"

11

for toddlers with disabilities and help families meet the needs of their toddlers with disabilities, Congress passed Part C of the IDEA to encourage states to create statewide programs to provide for developmentally delayed and disabled toddlers. 20 U.S.C. § 1431. Under Part C of the IDEA, IFSPs are developed with the consent and cooperation of toddlers' families. *Id.* at § 1436(a)(2). "The IFSP contains a statement of the child's present levels of development, goals to be achieved for the child and the child's family, and the services necessary to meet the stated goals." *Bucks County Dept. of Mental Health/Mental Retardation v. DeMora*, 379 F.3d 61, 66 (3d Cir. 2004) (citing 20 U.S.C. § 1436(d)). Services provided under Part C include family training and counseling, physical and occupational therapy, speech therapy, special instruction, and social work services. 20 U.S.C. § 1432(4)(E). These services are to be provided, whenever possible, in the child's "natural environment." *Id.* § 1432(4)(G). As under the better-known Part B of the IDEA, parents who are dissatisfied with their toddler's IFSP or services may file a due process claim against the state entity responsible for providing the services. *Id.* § 1439.

The County claims that the District Court made two errors when finding in the Ms' favor on their IDEA due process claim. It argues that the District Court inappropriately put the burden of proof on the County, as the defendant, to prove that services continued while the twins were at St. Faith's, and that the District Court improperly found that services were not provided in the twins' natural environment.

12

A.

The County first contends that the District Court improperly placed the burden on it to prove that appropriate services were provided to the twins. In its opinion, the District Court stated that the County failed to prove that any services were provided to the twins while they were at St. Faith's, as would have been the case if, for example, the twins had continued attending CADES in addition to St. Faith's. This, the County argues, impermissibly required it to bear the burden of proving the provision of services rather than requiring the Ms to prove the absence of services.

We begin our analysis of the appropriate burden of proof with the language of the statute. Under Part C of the IDEA, an aggrieved party may bring an action in a district court to resolve its grievance:

> Any party aggrieved by the findings and decision regarding an administrative complaint shall have the right to bring a civil action with respect to the complaint in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

13

20 U.S.C. § 1439(a)(1).[5] Section 1439 does not contain any indication of which party bears the burden of proof when a claim is brought.

As we have no case law directing the appropriate burden under Part C of the IDEA, we turn to relevant case law under Part B. Prior to 2005, most courts agreed that, at the due process hearing, the state or county providing services to individuals eligible under the IDEA bore the burden of proving that it was providing appropriate services. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391 (3d Cir. 2006). However, that changed with the Supreme Court's 2005 decision in *Schaffer v. Weast*, 126 S. Ct. 528 (2005). The Supreme Court made very clear that it was speaking only of the burden of persuasion – in other words which party loses if the evidence is closely balanced – and not of the burden of production – which party bears the obligation to come forward with the evidence at different points in the proceedings. *Id.* at 534. Because of the presumption that the plaintiff bears the burden of proving the essential elements of his claim, *id.*, and finding nothing in the language of the IDEA to suggest otherwise, *id.* at 535-37, the Supreme Court held that the burden of persuasion lies with the party seeking relief. *Id.* at 537. Therefore, when the school district challenges an Individualized Education Plan ("IEP") under Part B, the

---

[5]The County incorrectly cites 20 U.S.C. § 1415(i)(2) for the authorization of judicial review. Section 1415 provides the review process for claims under Part B of the IDEA, which deals with a free and appropriate education, not early intervention under Part C.

burden lies with it. When the parents challenge the IEP, the burden lies with them. We see no reason why the burden of persuasion would lie with a different party under Part C.

In addition to bearing the burden of persuasion, the party challenging an administrative decision faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct. Although a district court may make its own findings of fact by a preponderance of the evidence and look at evidence outside the administrative record, it is required to give the administrative decision "due weight." *Shore Reg'l High Sch.*, 381 F.3d at 199 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982)). "Under this standard, '[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and '[i]f a reviewing court fails to adhere to them, it is obliged to explain why.'" *Id.* (quoting *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)). In the case before us, these standards interact in an unusual fashion. In most cases under the IDEA, a party challenging an administrative decision will need to challenge the findings of the Hearing Officer. However, in this case, the Hearing Officer's factual determinations were favorable to the Ms. It was only her failure to provide appropriate compensation and her failure to address the Ms' RA claim that the Ms challenged. Therefore, while the Ms bore the burden of persuasion at the District Court level, the County was bound by the Hearing Officer's determinations unless it could provide specific evidence as to why those findings were incorrect. With this in mind, we turn to the District Court's finding regarding the provision of services.

15

In her decision, the Hearing Officer made several factual findings. She determined that the twins were not provided services at St. Faith's prior to the time the County sent people to observe them. "Months went by before MH/MR [the County] even agreed to observe [the twins] at St. Faith[']s let alone provide services there although St. Faith[']s was [the twins'] natural environment." The District Court had to give due weight to that decision. However, the Hearing Officer did not explicitly find that the County failed to provide services to the twins at a location *other* than St. Faith's, such as CADES. Therefore, the District Court's statement that "[t]he County has not argued here, nor did [it] argue before the H[earing] O[fficer], that the prescribed services were actually provided between January and June, 2003, such as if, for example, the children attended both CADES and St. Faith's at the same time[,]" was made based on its own review, not by giving due weight to the Hearing Officer's determination.

In their papers before the District Court, the Ms argued that "the County failed to provide the twins with special instruction for the first five months that they were in the natural environment." They further alleged that "each twin is entitled to compensatory education for missing special instruction that [was] identified on each one's IFSP but which [was] not delivered from the point the County stopped delivering the service until such time as the Team developed a new IFSP." "Each twin was denied 20 hours of special instruction from January 2003 until June 2003 – 100 hours each." In support of this contention, the Ms pointed to the fact that Mrs. M. requested that services currently provided at the CADES center be transferred to St. Faith's, subsequently enrolled her children

16

in St. Faith's, and then twice requested that services be provided at St. Faith's. This, the Ms argue, allows for a reasonable inference that the twins were not being provided services anywhere. The County countered merely by stating that the Ms did not provide sufficient evidence that services were not provided. It never argued that services actually were provided. In its opinion, the District Court faulted the County for failing to argue that services were provided or provide any evidence of the continuation of services. The County argues that this improperly shifted the burden of proof.

However, we need not decide whether under these circumstances – where a party opposes summary judgment simply by claiming a lack of proof rather than by disputing a material fact – the District Court improperly placed the burden on the defendant. The Ms did not need to prove that services stopped entirely in order to prove their claim. Just as a state agency may violate Part B of the IDEA by providing services but failing to do so in the least restrictive environment, *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578-79 (3d Cir. 2000), when an agency provides EI services but fails to provide them in the natural environment without appropriate justification, that agency violates Part C of the IDEA. *See* 20 U.S.C. § 1432(4)(g); 34 C.F.R. § 303.344(d)(a)(ii). As the Ms' claim rests on the fact that services were not delivered *at St. Faith's*, a fact the County admits, any error the District Court

17

may have made by requiring the County to prove that it provided services elsewhere was harmless.[6]

B.

The question we are left with, then, is not whether there was sufficient evidence to show that services were stopped altogether, but whether the District Court appropriately found that the County had violated the IDEA by not providing EI to the twins at St. Faith's. In other words, we must address whether St. Faith's is the kind of natural environment contemplated by the IDEA.

We again begin with the language of the statute. Part C of the IDEA provides money to states that "develop and implement a comprehensive, coordinated, multidisciplinary, interagency system that provides early intervention services for infants and toddlers with disabilities and their families." 20 U.S.C. § 1431(b)(1). Those services are to be provided, when possible, in the child's "natural environment." *Id.* § 1432(4)(G). The child's natural environment includes "the home and

_____

[6]We note that on appeal the County only claims that the Ms failed to prove a violation of the IDEA, not that, even if they had proved a violation of the IDEA, compensatory education was the inappropriate remedy. Proof of a violation of Part C of the IDEA does not require complete cessation of services. We make no comment as to whether receiving compensatory education as a remedy under Part C of the IDEA requires proof of the total termination of services.

18

community settings in which children without disabilities participate." 34 C.F.R. § 303.12(b). The regulations further define natural environment as "settings that are natural or normal for the child's age peers who have no disabilities." *Id.* § 303.18. Examples of such natural environments include "the home, child care centers, or other community settings." *Id.* § 303.344, n. 1. If services will not be provided in a natural environment, the IFSP must include a justification. *Id.* § 303.344(d)(a)(ii).

In the present case, the Hearing Officer determined, and the District Court agreed, that the twins were denied access to special instruction in their natural environment. As the County did not appeal the decision of the Hearing Officer, it appears that it is bound by that decision. However, even if it was not bound by that legal determination, its claim would still fail. At this stage, the County argues that "natural environment" does not include preschools. It turns first to the language used to describe natural environment as support. Citing to Note 1 of 34 C.F.R. § 303.344, the County states "[n]atural environments have been described by the Legislature as including home, child care centers and community settings, not preschools." This argument reads the list of "natural environments" too narrowly. Note 1 to § 303.344 reads:

> However, for these and other eligible children, early intervention services must be provided in natural environments (***e.g.***, the home, child care centers, or other community settings) to the maximum extent appropriate to the needs of the child.

19

34 C.F.R. § 303.344, n. 1 (emphasis added). Clearly this list of examples is not exclusive, hence the "e.g." Natural environments can encompass more than simply homes and child care centers.

In fact, the regulations define "natural environment" much more broadly than the list provided in Note 1 to § 303.344. Natural environments are "settings that are natural or normal for the child's age peers who have no disabilities." *Id.* § 303.18. The question is whether St. Faith's was a normal setting for a child the twins' age without disabilities. The twins' IFSP team determined that both boys required "a structured environment that provides a balance of adult direction and child[-]centered activities" and "modification[s] to maximize communication and interaction with peers and adults." Parents looking to encourage their non-disabled child's interaction with peers and adults and engage their child in child-centered activities would likely enroll their child in a day care or preschool. Therefore, St. Faith's is precisely the kind of natural environment contemplated by the IDEA.[7]

_____

[7]The County makes a further argument that only the twins' home could be their natural environment. It argues that the IFSP provided a justification for the twins' enrollment in the CADES center-based program. Therefore, it argues, that must indicate that anything outside the home was outside the twins' natural environment. This argument is spurious. The justification was required for the CADES center-based program because the center was a segregated center strictly for disabled children, which is clearly outside a setting that is natural for a

20

The County also argues that the Hearing Officer's comparison between the "natural environment" requirement in Part C of the IDEA and the "least restrictive environment" requirement under Part B of the IDEA was error. Under Part B of the IDEA, a child must be provided with educational services in the "least restrictive environment." 20 U.S.C. § 1412(a)(5). This has often been referred to as the "mainstreaming component" and requires that, if possible, children with disabilities be educated with non-disabled children. *See Ramsey*, 435 F.3d at 390. In her discussion about the natural environment, the Hearing Officer used case law on the least restrictive environment as guidance, citing factors typically considered in those types of cases. We find this analogy appropriate and useful. The Hearing Officer did not determine that a school is always the child's natural environment, as is the case with the least restrictive environment. Rather, she simply determined that the County had failed to make any showing as to efforts it made to provide the twins with services in their natural environment or to provide them with supplemental services in that environment, factors typically considered when determining if a state has provided appropriate services.[8]

child the twins' age without a disability. 34 C.F.R. § 303.18.

[8]At the time the Hearing Officer made her decision, *Schaffer* was not yet decided, and our leading case, *Oberti v. Board of Education*, 995 F.2d 1204, 1219 (3d Cir. 1993), placed the burden of proof on the school district or county. Therefore, the County does not argue that the Hearing Officer erred by placing the burden of proof on the County at the due process

21

Therefore, her award of reimbursement did not amount to requiring the County to provide the twins a free and appropriate education (a requirement not included under Part C), but was simply a determination that the twins' natural environment for social interaction was a preschool and that the County failed to provide them services in that natural environment. Because the Hearing Officer and the District Court appropriately determined that the twins were not provided EI services in their natural environment, the County's argument fails.[9]

IV.

The County next claims that the District Court erred by granting the Ms attorney's fees under the RA. It argues, first, that the Ms failed to prove a violation of the RA, and, alternatively, that even if the Ms had proved a violation,

_____

hearing.

[9]We note again that the County only appeals the grant of compensatory education based on a claimed error in the District Court's understanding of natural environment, not on the District Court's choice to award compensatory education in addition to the tuition reimbursement provided by the Hearing Officer. While reimbursement of professional (EI) services is certainly proper to remedy inadequate services under Part C of the IDEA, *Adams v. Oregon*, 195 F.3d 1141, 1150 (9th Cir. 1999), whether a parent can recover both preschool or child care fees in addition to early intervention services is a question we need not reach today.

22

attorney's fees are not appropriate because Part C of the IDEA does not allow such a recovery. We agree with the County that the Ms failed to prove a violation of the RA.

The Ms premised their RA violation on the same facts used to prove their IDEA claim, namely that the County failed to provide services for their sons in their natural environment. In its opinion, the District Court found that this was sufficient to prove a violation of the RA. Citing our opinions in *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3d Cir. 1997), and *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995),[10] the District Court stated that "there are very few differences, if any, between the IDEA's affirmative duty to educate a handicapped child and the Rehabilitation Act's prohibition in § 504 of discrimination against a handicapped individual." Therefore, because the Ms had proved a violation of the IDEA, the District Court concluded that they had also proved a violation of the RA. The District Court was incorrect.

Our case law makes clear that a party may use the same conduct as the basis for claims under both the IDEA and the RA. In *Matula*, we found that "Congress specifically intended that [Education of the Handicapped Act, the predecessor to the

---

[10]We recognize that we have recently decided *A.W. v. Jersey City Pub. Sch.*, -- F.3d. ---, 2007 WL 1500335 (3d Cir. May 24, 2007), which abrogated *Matula* in part. *Id.* at *3. However, our holding in *A.W.* does not affect *Matula* as it pertains to this case. For purposes of the question currently before us, *Matula* remains good law.

23

IDEA,] violations could be redressed by § 504 . . . as the legislative history reveals." 67 F.3d at 494. However, this language does not indicate that a violation of the IDEA is a *per se* violation of the RA, regardless of whether it meets the independent requirements for an RA violation. As our case law indicates by citing the requirements of the RA even in cases also brought under the IDEA, *see Ridgewood*, 172 F.3d at 253, that a plaintiff must still prove that there was a violation of the RA.

Section 504 of the RA states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Under the regulations that accompany the RA, "qualified handicapped person" includes:

> (2) With respect to public preschool[,] elementary, secondary, or adult educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide

such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under section 612 of the Education of the Handicapped Act;

. . .

(4) With respect to other services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

34 C.F.R. § 104.3(l).

Based on this language, it is clear why violations of Part B of the IDEA are almost always violations of the RA. Under § 612 of the IDEA, states accepting federal funds must provide children of a certain age a free and appropriate public education. 20 U.S.C. § 1412. The regulations accompanying the RA adopt this requirement and provide that a handicapped person is one "to whom a state is required to provide a free appropriate public education under section 612 . . . ." 34 C.F.R. § 104.3(k). Therefore, when a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim. Therefore, a plaintiff can prove an RA violation where "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from

25

participation in, denied the benefits of, or subject to discrimination at, the school." *Ridgewood*, 172 F.3d at 253.

As the County argues, the analysis is not the same under Part C of the IDEA as it is under Part B. As we have established, children denied services under Part B of the IDEA are "otherwise qualified" to participate in school and are denied that education because of their disabilities. However, children under the age of three, who are covered by Part C of the IDEA, are not entitled to a free and appropriate education under § 612. More specifically, the only reason children receiving services under Part C of the IDEA are entitled to such services is by reason of their disability. Therefore, when an agency violates Part C of the IDEA, it does not use disability as a basis to deny a child something to which he is entitled. Rather, the state denies a child services to which he is entitled only because of his disability but on some other basis. In this case, the reason the M twins' services fell short was not because they were disabled, as is the case when children under Part B of the IDEA are denied the education guaranteed to non-disabled children, but because the County misunderstood the concept of natural environment. While this is a violation of the IDEA, it is not a violation of the RA. A plaintiff cannot make out an RA claim simply by proving (1) that he was denied some service and (2) he is disabled. The state must have failed to provide the service for the sole reason that the child is disabled. *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998) (holding that the disability must be the cause of the discrimination or denial of benefits or services). Because the Ms did not establish a violation of the RA and because

26

attorney's fees are not available under Part C of the IDEA, the District Court erred when granting them attorney's fees.[11]

## V.

For the reasons set forth above, we will affirm the District Court's grant of summary judgment and award of compensatory education on the Ms' IDEA claim, but will reverse the District Court's grant of summary judgment and award of attorney's fees on the Ms' RA claim and remand so that the District Court may enter summary judgment in favor of the County on that claim.

---

[11]The Ms also made a claim for attorney's fees under the ADA. The District Court never reached that claim as it granted them attorney's fees based on the RA. However, the ADA, like the RA, includes a requirement that the plaintiff be denied services on the basis of his disabilities. Because we have already determined that this was not the reason the M twins were denied services, any claim under the ADA must also fail.

27